# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black;">

### *People v. Jones*, 2019 IL App (3d) 160268

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID E. JONES, Defendant-Appellant. |
| District & No. | Third District No. 3-16-0268 |
| Filed | November 1, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 11-CF-1994; the Hon. Amy M. Bertani-Tomczak, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Matthew Lemke, of State Appellate Defender's Office, of Ottawa, for appellant. |
| | James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion. Justice Wright concurred in the judgment and opinion. Justice Wright also specially concurred, with opinion. Justice Holdridge dissented, with opinion. |

**OPINION**

¶ 1        Defendant, David E. Jones, appeals from his conviction for unlawful delivery of a controlled substance within 1000 feet of a church. Defendant raises three issues on appeal: (1) plain error occurred when the court (a) employed the video viewing procedure that intruded upon the secrecy of jury deliberations, (b) failed to ask the potential jurors if they accepted the four principles stated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), (c) issued an insufficient modified pattern jury instruction on the evaluation of witness identification testimony, and (d) permitted the State to elicit testimony that suggested defendant was involved in other crimes after it prohibited the State from introducing other-crimes evidence; (2) if this court does not find that any of the errors are plain errors, then the cumulative effect of the errors deprived defendant of his right to a fair trial; and (3) remand for resentencing is required because a statutory amendment renders the charge enhancement inapplicable. We affirm.

¶ 2                                                I. BACKGROUND

¶ 3        The State charged defendant with two counts of unlawful delivery of a controlled substance within 1000 feet of a church (720 ILCS 570/407(b)(1) (West 2010)). Both charges were Class X felonies. Before jury selection, the State dismissed the first count.

¶ 4        During jury selection, the court asked the prospective jurors whether they understood and accepted that a person accused of a crime is presumed innocent of the charge against them. The court then asked the prospective jurors if they understood that the State must prove defendant's guilt beyond a reasonable doubt, defendant is not required to offer any evidence on his behalf, and if defendant does not testify, it cannot be held against him.

¶ 5        After the parties selected a jury, defense counsel made an oral motion to preclude Romeoville police officer Mimi Bejda from testifying to any evidence that suggested defendant had been involved in other crimes. The court granted defense counsel's motion stating:

> "So you're clear on—that she's going to identify him, if she can, based on what she saw in the car on April 1st. And even if she says the voice in the car is the same one I talked to on the phone, I don't know, but nothing about any prior phone calls or prior face to face meetings because of the *nolle* and because of the motion *in limine*."

¶ 6        At trial, Bejda's testimony described the details of a controlled narcotics buy that occurred on April 1, 2011. During her testimony, the State asked:

> "Q. And at approximately 1:30 [on April 1, 2011,] did you make any telephone calls?
>
> A. I did.
>
> Q. And did you speak to somebody—did you speak to somebody at approximately 1:30 on the telephone?
>
> A. Yes. I phone called somebody named David Jones, we knew him as Smiley, and I arranged to purchase a ball or an eighth of an ounce of crack cocaine from him for $150.
>
> * * *
>
> Q. So you made the call. When did you arrange to meet the person?

A. I said I'd be in the area of the Certified Foods on Jackson in approximately an hour."

¶ 7      At 3:05 p.m., Bejda arrived at the prearranged location. Bejda called the number that she had used to arrange the buy and spoke with the same person who she had arranged the transaction. One to two minutes later, a man wearing a dark-colored jacket and a baseball hat exited a dark-colored vehicle and entered Bejda's vehicle. The man sat in the passenger seat, approximately one foot away from Bejda. Bejda recognized the man by the sound of his voice as the individual that she had spoken with on the telephone. The man gave Bejda a small bag of an off-white rocky substance in exchange for $150. Bejda asked the man if he could "take care of [her] next week?" The man replied "yes" and exited the vehicle. A field test indicated that the substance contained cocaine. Bejda identified defendant as the man whom she had previously spoke to on the telephone and purchased the narcotics from.

¶ 8      After the exchange, Bejda and Detective Mark Lauer measured the distance from the spot where the transaction took place to the neighboring Our Lady of Mount Carmel Catholic Church. The two locations were separated by 599 feet.

¶ 9      Bejda also stated that Illinois State Trooper Jason Holt video recorded the transaction. The court admitted the recording into evidence and played it for the jury.

¶ 10      The video is approximately two minutes in length and shows a black male wearing a black coat and baseball hat enter Bejda's vehicle. The audio captures Bejda's voice confirming the price of the narcotics and then asking if the man can supply Bejda with additional drugs the following week. The man's response is inaudible. The man then exits Bejda's vehicle and gets into a blue Hyundai and drives out of the parking lot.

¶ 11      Holt testified that he participated in the April 1, 2011, undercover narcotics operation. Holt said that Bejda had arranged to purchase crack cocaine from defendant whose nickname was "Smiley." Holt went to the Certified Foods parking lot before Bejda to conduct surveillance. Holt saw Bejda drive into the parking lot. Then a man wearing a coat and a baseball hat entered the passenger side of Bejda's vehicle. After the man exited Bejda's vehicle, he got into a nearby blue Hyundai and drove away.

¶ 12      Lauer testified that on April 1, 2011, he assisted with the undercover narcotics purchase. Lauer followed Bejda to the Certified Foods parking lot and then parked across the street near a church. When Bejda exited the parking lot, Lauer followed her to a predetermined location where Bejda weighed and tested the suspected narcotics. Lauer returned to the Certified Foods parking lot several months after the narcotics buy to measure the distance from the location of the buy to the church where Lauer had parked. The church was 599 feet from the location of the sale. Lauer testified that the church was "active" on the date of the sale.

¶ 13      Plainfield police officer Matt Lehmann testified that he assisted with the April 1, 2011, narcotics buy. Lehmann provided security for Bejda while Bejda conducted the transaction. Around 3:07 p.m., Lehmann saw a man get into Bejda's parked vehicle. The man stayed in Bejda's vehicle for approximately one to two minutes. The man then exited Bejda's vehicle, got into a blue Hyundai, and drove away.

¶ 14      Forensic scientist Aurelia Rizo testified that she tested the substance that Bejda had purchased. The substance weighed 1.7 grams and contained cocaine.

¶ 15      Before deliberations, the court instructed the jury:

"When you weigh the identification testimony of a witness, you should consider all of the facts and circumstances in evidence, including, but not limited to, the following:

The opportunity the witness had to view the offender at the time of the offense."

¶ 16 During deliberations, the jury asked to rewatch the surveillance video. The court reviewed the jury's note with the parties and indicated that it was going to grant the jury's request and allow the jury to rewatch the video in the courtroom. The court indicated that it and the parties were going to be present during the viewing and commented "[t]here's not going to be any questions, it's just going to be view, leave." After the jurors entered the courtroom, the following colloquy occurred:

"THE COURT: Okay. I received a question you wanted to view the video, so we have it right here.

[STATE'S ATTORNEY]: With the Court's permission, I'll play it.

THE COURT: Yes.

(Videotape was played in open court.)

THE COURT: Is that enough or did you want to see it again?

THE FOREPERSON: I think we are good.

THE COURT: Okay. Thank you."

Following this exchange, the jury retired to the jury room to continue deliberations. After an unspecified amount of time, the jury indicated that it had reached its verdict. The jury found defendant guilty of unlawful delivery of a controlled substance within 1000 feet of a church. On May 13, 2016, the court sentenced defendant to six years' imprisonment.

¶ 17                                    II. ANALYSIS
¶ 18                                    A. Plain Error
¶ 19 Defendant argues that four errors require that his conviction be reversed and remanded for further proceedings. Defendant concedes that he forfeited review of these errors, but he argues that each is reversible plain error. The plain error doctrine provides a limited exception to the general rule of forfeiture. *People v. Herron*, 215 Ill. 2d 167, 177 (2005). The first step of the plain error doctrine is to determine whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). The word " 'plain' " is "synonymous with 'clear' and is the equivalent of 'obvious.' " *Id.* at 565 n.2. If we find that the court committed "plain" error, then we must determine if the error is reversible. *People v. Rippatoe*, 408 Ill. App. 3d 1061, 1066 (2011). Plain errors are reversible only where defendant establishes prejudice. A defendant may establish prejudice in one of two ways. First, a defendant may demonstrate that the trial evidence was so closely balanced that the error threatened to impact the result of the trial. *People v. Sebby*, 2017 IL 119445, ¶ 51. Second, a defendant may show that an error is so serious that prejudice is presumed, regardless of the closeness of the evidence. *Id.* ¶ 50.

¶ 20                              1. Video Viewing Procedure
¶ 21 Defendant argues the court's in-courtroom video viewing procedure is structural error because it intruded on the privacy of jury deliberations, inhibited the jury's consideration of the evidence, and required the jury to watch the video exhibit in the presence of nonjurors.

Specifically, defendant challenges the court's decision to allow the jury to view the video in the courtroom while the court, the parties, and the bailiff were present.

¶ 22    The trial court has the discretion to grant or deny the jury's request to review evidence. *People v. Kliner*, 185 Ill. 2d 81, 163 (1998). The court is also vested with discretion to determine what exhibits the jury may have in the jury room. *People v. McKinley*, 2017 IL App (3d) 140752, ¶ 16.

¶ 23    This issue is rooted in the fundamental tenet of our judicial system that "jury deliberations shall remain private and secret." *People v. Johnson*, 2015 IL App (3d) 130610, ¶ 17 (citing *United States v. Virginia Erection Corp.*, 335 F.2d 868, 872 (4th Cir. 1964)). This honored rule is intended to protect the jury from improper influence. *United States v. Olano*, 507 U.S. 725, 737-38 (1993). While the presence of a third party impinges on the privacy and secrecy of deliberations, it warrants reversal only where harm results from the intrusion. *Id.* at 738. Therefore, we generally review these jury intrusions for prejudicial impact. *Johnson*, 2015 IL App (3d) 130610, ¶ 19.

¶ 24    There is, however, a split of authority in this district as to whether permitting nonjurors to watch video-recorded evidence alongside a deliberating jury is inherently prejudicial. In *People v. Hollahan*, 2019 IL App (3d) 150556, the jury sent a request to the court to watch a videotape of defendant's traffic stop. *Id.* ¶ 10. The court arranged for the jury to watch the video in the courtroom, as it did not have the ability for the jury to watch it in the jury room. The court also allowed defendant, the attorneys for defendant and the State, and the two alternate jurors to remain in the courtroom while the jury watched the video. Before the jury was brought into the courtroom, the court admonished defendant, the attorneys, and the alternate jurors that " '[n]o one will have any conversation.' " *Id.* After the jury was brought in, the court said that it had " 'instructed everyone to not say a word and we will play the video for you. If you need to have the sound adjusted or anything that we can do, all right?' " *Id.* The jury viewed the video and then returned to the jury room to resume deliberations and ultimately found defendant guilty. *Id.* ¶ 11. On appeal, a split panel of this court found that the video viewing procedure employed by the circuit court was "presumptively prejudicial" and reversible under the second prong of the plain error analysis because "the presence of the parties, their attorneys, and trial judge during jury deliberations was inherently intimidating and necessarily impeded or inhibited the jurors' free discussion and deliberation as the video was being shown to them." *Id.* ¶¶ 29-30.

¶ 25    In *Johnson*, 2015 IL App (3d) 130610, ¶¶ 7, 9, during deliberations, the jury asked to see the video recording of defendant's acts of battering a police officer and resisting arrest a third time. The court agreed to let the jury rewatch the video, but before it brought the jury into the courtroom, it told defendant and the attorneys that they "would be silent." *Id.* ¶ 9. The court explained to the parties that it was playing the video in the courtroom because there was no equipment in the jury room on which the jury could watch the video. *Id.* The court, parties, and counsel were present while the jury watched the video in the courtroom. *Id.* ¶ 10. Sometime after watching the video, the jury found defendant guilty of aggravated battery against a peace officer and resisting arrest. *Id.* ¶ 11. In a split decision on appeal, the majority held that "[t]he record must demonstrate that prejudice resulted or that there was an intent to influence the jury's decision." *Id.* ¶ 19. The majority further concluded that the record showed no prejudice, as the jury had viewed the video twice during the trial, the parties and defendant were admonished that they were not allowed to verbally communicate with the jury, and neither the

State nor defense attempted to do so. *Id.* ¶ 20. Additionally, the jury's continued deliberation, without asking to see the video again, indicated that it considered the evidence to its satisfaction. *Id.* Ultimately, nothing in the record suggested that the court, State, or defense affected the jury's ability to analyze the video evidence. *Id.*

¶ 26    After reviewing the intradistrict split, we follow our decision in *Johnson* and review the trial court's procedure for its prejudicial impact.

¶ 27    In this case, defendant has not met his burden of showing that the presence of the court, attorneys, defendant, and bailiff during the jury's viewing of the video caused him prejudice. Like *Johnson*, the judge spoke to the jury before the video was replayed; the parties and bailiff remained silent while the jury viewed the video. The court explained the procedure used to play the video and inquired if the jury desired to see the video a second time. The record establishes that the jury watched the video and then returned to the jury room to deliberate. The record contains no indication that the presence of the nonjurors affected the jury's viewing of the video. The jury reached its verdict without any additional questions. The defendant has not shown prejudice by the viewing procedure; no plain error occurred.

¶ 28                                2. Illinois Supreme Court Rule 431(b)

¶ 29    Defendant argues the court committed plain error when it asked the potential jurors if they "accepted" the four principles stated in Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and failed to ask if they "understood" three of the four principals. Defendant further contends that this error is reversible plain error because the evidence was closely balanced.

¶ 30    Rule 431(b) requires the court to ask each potential juror if they both understand and accept: "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her." *Id.*; see also *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).

¶ 31    The State concedes that the court failed to ask the potential jurors whether they understood and accepted Rule 431(b) principles two through four. After reviewing the *voir dire* transcripts, we accept the State's partial concession. This does not end our inquiry, however. Because defendant forfeited review of this error, it is only subject to reversal if the evidence was closely balanced.

¶ 32    To determine if the trial evidence was close, we must "evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. This analysis involves an assessment of the elements of the charged offense and any evidence of the witnesses' credibility. *Id.*

¶ 33    Unlawful delivery of a controlled substance within 1000 feet of a church requires proof that defendant knowingly delivered more than 1 to 15 grams of a substance containing cocaine (720 ILCS 570/401(c)(2) (West 2010)) within 1000 feet of a church (*id.* § 407(b)(1)). The evidence of these elements was not close. Bejda testified that she contacted defendant by telephone to purchase cocaine. Defendant met Bejda at a parking lot that was 599 feet from a church. Defendant gave Bejda 1.7 grams of a substance containing cocaine in exchange for $150. Bejda's testimony of the events and defendant's identification was highly credible as it was partially corroborated by several other police witnesses, and the exchange described by

Bejda was video and audio recorded. Therefore, the evidence of defendant's guilt was not close, and as a result, the court's Rule 431(b) error is not reversible plain error.

¶ 34                           3. Identification Testimony Jury Instruction

¶ 35    Defendant argues the court's issuance of an insufficient modified pattern jury instruction is reversible plain error because the instruction omitted four of the five factors pertinent to the jury's assessment of Bejda's identification testimony. Defendant contends that this error is reversible under the first prong of the plain error test because the evidence is closely balanced.

¶ 36    We review the jury instructions provided by the circuit court for an abuse of discretion. *People v. Rodriguez*, 387 Ill. App. 3d 812, 821 (2008). We review the jury instructions in their entirety to determine if they fairly, fully, and comprehensively inform the jury of the relevant law. *Id.* We will find an abuse of discretion where the court's ruling is " 'arbitrary, fanciful, or unreasonable, or where no reasonable person could take the view adopted by the trial court.' " *Id.* (quoting *People v. Purcell*, 364 Ill. App. 3d 283, 293 (2006)).

¶ 37    Illinois Supreme Court Rule 451(a) (eff. Apr. 8, 2013), requires the circuit court to use the Illinois Pattern Jury Instructions when an instruction is "applicable in a criminal case, giving due consideration to the facts and the governing law *** unless the court determines that it does not accurately state the law."

¶ 38    Illinois Pattern Jury Instructions, Criminal, No. 3.15 (Dec. 8, 2011) (hereinafter IPI Criminal No 3.15) states the law "for assessing the reliability of identification testimony." *Piatkowski*, 225 Ill. 2d at 567. IPI Criminal No. 3.15 is derived from the Supreme Court's decision in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). *Piatkowski*, 225 Ill. 2d at 567. It also states the law in Illinois for the purpose of assessing the reliability of witness identification testimony. *Id.* IPI Criminal No. 3.15 states, in its entirety,

>    "When you weigh the identification testimony of a witness, you should consider all the facts and circumstances in evidence, including, but not limited to, the following:
>
>    [1] The opportunity the witness had to view the offender at the time of the offense.
>    [2] The witness's degree of attention at the time of the offense.
>    [3] The witness's earlier description of the offender.
>    [4] The level of certainty shown by the witness when confronting the defendant.
>    [5] The length of time between the offense and the identification confrontation."

The Committee Note directs courts to "[g]ive numbered paragraphs that are supported by the evidence," and "[t]he jury should be instructed on only the factors with any support in the evidence. Other factors should be omitted." IPI Criminal No. 3.15, Committee Note (amended July 28, 2017).

¶ 39    In this case, the witness identification instruction provided by the court included only the first factor of IPI Criminal No. 3.15. However, the record supported instructing the jury on the second, fourth, and fifth factors. Regarding the second factor, Bejda described the events that preceded the controlled buy and her interaction with defendant during the buy. She did not indicate the degree of attention that she paid to the suspect's identity. Bejda's testimony also did not establish her level of certainty in her identification, which implicated the fourth factor. Finally, the fifth factor is the most strongly implicated as more than four years elapsed between the narcotics buy and Bejda's in-court identification of defendant.

¶ 40    The trial court erred by not including the second, fourth, and fifth factors of IPI Criminal No. 3.15 in its instruction. However, this was not reversible because the evidence was not closely balanced. See *supra* ¶ 33.

¶ 41                                    4. Other-Crimes Evidence

¶ 42    Defendant argues Bejda testified to defendant's involvement in other crimes violating the court's ruling barring the evidence. Specifically, defendant argues that Bejda's testimony that she knew defendant by an alias suggested that the police had a prior familiarity with defendant and was indicative of defendant's commission of another crime. See *People v. Bryant*, 113 Ill. 2d 497, 514 (1986); *People v. Carter*, 297 Ill. App. 3d 1028 (1998). Defendant contends that this is reversible plain error because the evidence is closely balanced.

¶ 43    In *Bryant*, the supreme court considered whether evidence of a police officer's prior familiarity with defendant prejudiced the outcome of the trial. The supreme court conducted this analysis after it granted defendant a new trial on other grounds. The trial evidence included testimony from a police officer who ordered defendant to stop running from the police. On cross-examination, the officer indicated that he called defendant by name saying " 'I told him to freeze. He kept on going. I called him by name and told him I would shoot.' " *Bryant*, 113 Ill. 2d at 514. The State referenced the officer's use of defendant's name twice during its closing argument. Although the record did not indicate how the officer knew defendant's name, the supreme court noted that the officer's testimony implied that defendant had a criminal history and "for that reason it is better avoided, unless somehow relevant." *Id.*

¶ 44    In *Carter*, the First District addressed the same issue of whether the State's introduction of an officer's prior familiarity with defendant was error. An officer testified that he saw defendant the day before his arrest. Then, immediately before defendant's arrest, the same officer identified defendant to several other police officers. When the officer approached defendant to effectuate the arrest he said " 'Larry I just saw you do two deals.' " *Carter*, 297 Ill. App. 3d at 1035-36. The First District found that the officer's statement created an "obvious inference" that Carter had been engaged in prior criminal activity. *Id.* The First District noted that "[e]ven where a prosecutor does not argue prior familiarity with a defendant is evidence of criminal conduct, the implication may be conveyed by testimony and 'is better avoided, unless somehow relevant.' " *Id.* (quoting *Bryant*, 113 Ill. 2d at 514). The First District concluded that there was no relevant purpose for the officer's repeated references to his knowledge of defendant's name. *Id.*

¶ 45    We find the cases relied on by defendant to be inapplicable for two reasons. First, in *People v. Adkins*, 239 Ill. 2d 1, 27 (2010), the supreme court noted that its discussion in *Bryant* of a police witness's prior familiarity with defendant "was *dicta*, intended only to guide the trial court and the State on retrial," and it "did not suggest that any such error was sufficient to require a new trial." Though *Bryant* defined the best practice as barring evidence of a police officer's prior familiarity with a criminal defendant, it did not forbid it. Second, this case is factually distinct from *Bryant* and *Carter*. Here, Bejda made a single unsolicited reference to her prearrest knowledge of defendant's alias. This reference carried little prejudice as it did not indicate that defendant had a prior criminal interaction with the officer. The State did not mention Bejda's statement or reference it in closing argument. Therefore, the court did not err by failing to exclude Bejda's testimony that she knew defendant by the alias "Smiley."

¶ 46    Even if we found error, it would not rise to prejudicial error because the evidence was not closely balanced. See *supra* ¶ 33.

¶ 47                                B. Cumulative Error

¶ 48    Defendant argues, in the alternative, that if the aforementioned errors are not reversible plain error, then the cumulative effect of these errors deprived defendant of his right to a fair trial.

¶ 49    Two errors are apparent on the record: (1) the court's failure to ask each juror if they understood and accepted each of the Rule 431(b) principles and (2) the court used a witness identification instruction that did not fully reflect the facts of the case. Individually, each of these otherwise forfeited errors is not subject to reversal because the evidence was not closely balanced. However, in contrast to the first prong plain error analysis, the cumulative error test considers the prejudice caused by the error itself in combination with the other errors, and it does not consider the closeness of the evidence. *Cf. Sebby*, 2017 IL 119445, ¶ 68 (under the first prong of plain error, "prejudice rests not upon the seriousness of the error but upon the closeness of the evidence"). Therefore, we examine the combined effect of these errors to determine if they deprived defendant of his right to a fair trial. See *People v. Speight*, 153 Ill. 2d 365, 376 (1992).

¶ 50    The cumulative error analysis permits the reversal of a case where each error is individually deemed harmless or not plainly erroneous and where these errors together have the cumulative effect of denying defendant's right to a fair trial. See *id.* Under the cumulative error analysis, a new trial might be necessary even if the evidence of defendant's guilt is overwhelming because the errors create a "pervasive pattern of unfair prejudice to defendant's case." *People v. Blue*, 189 Ill. 2d 99, 139 (2000). In *Blue*, the supreme court initially found that several errors did not individually warrant reversal. See *id.* at 119-20. However, the supreme court concluded that the combination of the errors "may have coerced the jury into returning a verdict more likely grounded in sympathy than on a dispassionate evaluation of the facts," and therefore, the cumulative effect of the errors necessitated reversal. *Id.* at 120.

¶ 51    Here, the combined effect of the Rule 431(b) and jury instruction errors did not deprive defendant of his right to a fair trial. A Rule 431(b) error causes little prejudice absent evidence that the violation produced a biased jury. See *Sebby*, 2017 IL 119445, ¶ 52. The Rule 431(b) error in this case caused minimal prejudice because the court asked the jurors if they understood all four principles but failed to ask if they accepted three of the four principles. This questioning still presented the four principles to the potential jurors and permitted them to voice their view of each principle, albeit, without the full language and structure required by the rule. Further, defendant does not point to any evidence to show that the court's questioning resulted in a biased jury.

¶ 52    Second, the jury instruction error also caused defendant minimal prejudice. While the record supported the use of factors two, four, and five of IPI Criminal No. 3.15, the exclusion of these factors did not prejudice defendant. Bejda's identification of defendant as the individual who sold the narcotics was consistent and unrebutted. The additional instructions would have done little to bias the jury. Thus, we conclude that the cumulative effect of these errors did not deprive defendant of his right to a fair trial and require reversal.

¶ 53                                    C. Sentence

¶ 54      Defendant asks this court to vacate his sentence and remand for resentencing because, after the circuit court entered defendant's conviction, the legislature amended section 407(b)(1) of the Illinois Controlled Substances Act (Act) to reduce the Class X felony charge enhancement element of the distance from a church from 1000 feet to 500 feet. 720 ILCS 570/407(b)(1) (West 2018). Defendant argues that the amendment applies retroactively and, therefore, he should be resentenced as a Class 1 felony instead of a Class X felony.

¶ 55      We review *de novo* the issue of whether a statutory amendment should be applied retroactively. *People v. Atkins*, 217 Ill. 2d 66, 68 (2005).

¶ 56      In 2010, at the time of the instant offense, section 407(b)(1) of the Act stated "[a]ny person who violates: (1) subsection (c) of Section 401 *** within 1,000 feet of the real property comprising any church *** is guilty of a Class X felony." 720 ILCS 570/407(b)(1) (West 2010). In 2018, more than two years after the court imposed defendant's sentence, Public Act 100-3, amended section 407(b)(1) to reduce the charge enhancement from 1000 feet of a church to "within 500 feet of the real property comprising any church." Pub. Act 100-3 (eff. Jan. 1, 2018) (amending 720 ILCS 570/407).

¶ 57      In *People v. Larke*, 2018 IL App (3d) 160253, we addressed the related issue of whether the 2018 amendment to section 407(b)(1) applied retroactively to a defendant who had been convicted of a Class X felony of unlawful possession of a controlled substance with intent to deliver within 1000 feet of a school. Larke argued for the retroactive application of the 2018 amendment to section 407 of the Act. *Id.* ¶ 26. We concluded that the 2018 amendment, which became effective after the court imposed Larke's sentence, did not apply retroactively because the proceedings below had concluded before the amendment took effect. *Id.* ¶ 30; see also *People v. Hunter*, 2017 IL 121306, ¶¶ 54, 56 (defendants are not entitled to be resentenced under a new statutory amendment that went into effect while their case was on appeal after the sentence had already been imposed).

¶ 58      We agree with the *Larke* court's analysis. The defendant was sentenced in 2016, nearly two years before Public Act 100-3 amended the charge enhancement portion of section 407. When Public Act 100-3 became effective, defendant's case was pending on appeal. The general savings clause of section 4 of the Statute on Statutes prohibits the retroactive application of an amendment to defendant's case. 5 ILCS 70/4 (West 2010); see also *Hunter*, 2017 IL 121306, ¶¶ 21, 22, 33. The amendment to section 407 that altered the charge enhancing element does not apply retroactively to defendant.

¶ 59                                    III. CONCLUSION

¶ 60      The judgment of the circuit court of Will County is affirmed.

¶ 61      Affirmed.

¶ 62      JUSTICE WRIGHT, specially concurring:

¶ 63      I agree with the analysis of the author on all issues. However, I write separately on the issue related to the republication of a video exhibit to the jurors.

¶ 64      Isolation, and at times full sequestration, eliminates the possibility that a juror's exposure to nonjurors during jury deliberations might have some impact on the verdict. After

- 10 -

deliberations began in this case, this jury was no longer isolated from all nonjurors. Instead, the court allowed nonjurors to become spectators in the courtroom as each juror reexamined an important exhibit. This was error. However, it is undisputed that this error was forfeited by defense counsel.

¶ 65 My decision to write separately is a result of the intradistrict split on this issue. I reject the notion that presumptive prejudice applies to this forfeited error. Instead, the facts of each case should be evaluated to determine if prejudice resulted from the court's error, as the author has done in this case. Without actual prejudice, plain error does not exist and forfeiture applies to this issue.

¶ 66 Finally, I note that the unavailability of equipment in the jury room is not a persuasive reason for bringing the jury back into the courtroom to reexamine an admitted exhibit. A borrowed laptop computer present in the jury room would have avoided the error at issue here. If borrowing or acquiring the relatively affordable technology for the jury room is not feasible, the possibility of reversible error will continue in similar cases.

¶ 67 JUSTICE HOLDRIDGE, dissenting:

¶ 68 I respectfully dissent from the majority's findings that the video viewing procedure employed by the circuit court was not error or plain error. I would find that the court plainly erred in allowing nonjurors to be present while the jury deliberated the video-recorded evidence. See *Hollahan*, 2019 IL App (3d) 150556, ¶ 30. Because I would find that the court's video viewing procedure was erroneous, I would reverse and remand the case for a new trial. I take no position on the other issues raised by the defendant.

¶ 69 While I agree with the majority that this issue is derived entirely from the principle that "jury deliberations shall remain private and secret" (internal quotation marks omitted), I find that the majority places insufficient weight on this tenet of our judicial system. *Supra* ¶ 23. I emphasize that the "primary purpose of this rule is to protect the jurors from improper influence." *Hollahan*, 2019 IL App (3d) 150556, ¶ 20 (citing *Olano*, 507 U.S. at 738). By removing the jury from the privacy of the jury room to watch and deliberate video-recorded evidence, the court exposes the deliberations to numerous external influences. While the court has discretion to determine whether to allow the jury to view video-recorded evidence and the manner in which such evidence may be viewed, I note that the court abuses its discretion if it allows the jury to review the evidence in a manner that results in an improper influence upon the deliberations. *Id.* We review intrusions upon jury deliberations for their prejudicial impact. *Id.* "An improper intrusion upon jury deliberations by a third party is prejudicial when it impedes or inhibits the jurors' deliberations." *Id.*; see also *Olano*, 507 U.S. at 739 (noting that the presence of alternate jurors in the jury room during juror deliberations could prejudice the defendant if the presence of the alternates "exert[s] a 'chilling' effect" on the jurors or "operate[s] as a restraint upon the regular jurors' freedom of expression and action").

¶ 70 Unlike the majority, I find that *Hollahan* directs the resolution of this case. Just as in *Hollahan*, the court permitted the jury to watch video-recorded evidence in the courtroom while the court, the State, defense counsel, and the defendant were present. As Justice McDade correctly observed in her dissent in *Johnson*, "it is hard to imagine a more intrusive, more chilling presence in the deliberations than the opposing parties—the defendant with his attorney and the State in the person of the State's Attorney—and the trial judge." *Johnson*, 2015 IL App (3d) 130610, ¶ 49 (McDade, P.J., dissenting). The state's attorney, the defense

counsel, and the defendant each had a direct interest in the outcome of the case and looked on as the jury actively deliberated the video-recorded evidence. Additionally, the court served as an authority figure presiding over the litigation. Before playing the video, the State said, in acknowledgment of the court's authority, "[w]ith the Court's permission, I'll play [the video]." The State's comment was especially chilling to the jurors' deliberations because it established that the State, an interested party, had direct control of the playback of the video and was operating under the court's direction. This indicated to the jury that it could not casually ask the State to pause, fast-forward, or rewind the video. Because the defendant's case was based on identity, the jury needed to be able to pay special attention to the portions of the video that showed the defendant's face and discuss the defendant's appearance. However, the structure of the proceeding effectively rendered any type of fluid review and open discussion of the video impossible. The record confirms that none of the jurors spoke while the video played, and when the court asked if the jurors wanted to see the video a second time, the foreperson declined the court's offer. While the foreperson's response may have indicated that the jurors were satisfied with a single viewing, it was also indicative that the jury felt a second viewing would be too much of an imposition to request. Overall, the presence of the third parties and strict structure of the in-courtroom proceeding clearly inhibited the jurors' deliberations and restrained their freedom of expression and action. Therefore, I would find that the presence of these parties during jury deliberations was prejudicial as it impeded the jurors' active deliberation of the video evidence.

¶ 71    I would further find that the video viewing procedure employed in this case amounted to structural error, and is therefore reversible under the second prong of the plain error doctrine. See *Hollahan*, 2019 IL App (3d) 150556, ¶ 29. The presence of the court, the State, defense counsel, and the defendant during the jurors' viewing of the video was a "systemic error" that "erode[d] the integrity of the judicial process and undermine[d] the fairness of the defendant's trial." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). As I noted above, the video evidence played a crucial role because the defense was based on identity. To properly consider the identity issue, the jury needed to carefully review and discuss the video evidence. However, it was unable to do so as the State controlled the playback of the video and the court loomed large as the authority figure overseeing the proceeding. This type of evidence is better deliberated in the privacy of the jury room where the jury has the freedom to control the speed of playback, pause the video to more closely examine the appearance of the individuals, and consider the evidence without the outside pressures of the parties and the court looking on. Thus, as in *Hollahan*, I would find that this intrusion upon the privacy of the jury deliberations impeded the jurors' freedom of expression and rendered the trial an unreliable means of determining the defendant's guilt or innocence. See *Hollahan*, 2019 IL App (3d) 150556. Ultimately, this type of intrusion should be deemed presumptively prejudicial as it both compromises the secrecy of the deliberations and subjects them to the external influences of the interested parties. See *id.* ¶ 30. For these reasons, I would reverse the defendant's conviction and remand the cause for a new trial.