**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 190364-U

Order filed September 1, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 14th Judicial Circuit, Rock Island County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0364 Circuit No. 18-CF-1105 |
| | ) | |
| JESSIE L. MILLSAP, | ) ) | Honorable Norma Kauzlarich, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE O'BRIEN delivered the judgment of the court.
Justices Daugherity concurred in the judgment.
Justice Schmidt specially concurred.

**ORDER**

¶ 1   *Held*:   The circuit court committed clear and obvious error in (1) barring defendant from introducing evidence bearing on a witness's motive to testify falsely; (2) barring defendant from cross-examining a witness about her drug use; (3) allowing a witness to bolster the credibility of another witness; and (4) allowing the State to make repeated references to defendant's postarrest silence. This series of errors cumulatively deprived defendant of a fair trial.

¶ 2 Defendant, Jessie L. Millsap, appeals following his conviction on two counts of domestic battery. He raises a multitude of arguments regarding his convictions and sentences. We vacate those convictions and remand for further proceedings.

¶ 3 I. BACKGROUND

¶ 4 The State charged defendant via criminal complaint with one count of aggravated unlawful restraint (720 ILCS 5/10-3.1 (West 2008)) and two counts of domestic battery (*id.* § 12-3.2(a)(1), (a)(2)). The complaint alleged that defendant struck Debbra Locey, a family or household member, in her face with his fist.

¶ 5 Prior to trial, the State filed a motion *in limine* seeking to bar the defense from introducing evidence at trial relating to "[p]rior police contacts and untried charges relating to the victim." In its motion, the State further averred:

"The State has reason to believe that subpoenaed materials from [the] Rock Island Police Department contain information on prior charges, arrests and/or investigations that the victim was not convicted of. Any evidence of these incidents is irrelevant to the issues in front of the trier of fact, and are not proper for attempted impeachment."

¶ 6 In hearing the motion *in limine* on the day of the trial, the court allowed defendant to make a statement, in which he explained the prior events to which the State's motion referred. Defendant stated Locey and her boyfriend previously lived in defendant's apartment while he was in jail. Upon his return from jail, defendant discovered that Locey and her boyfriend had stolen many of his belongings. Defendant filed a police report to that effect, and defense counsel confirmed that she had obtained the police report. Defendant further stated that Locey had been evicted from her apartment just days after the incident giving rise to the present charges and had been living in his

apartment while he remained in jail. He added: "All [Locey is] concerned about is staying at my house. Staying at my house and making sure that I'm not getting out."

¶ 7    Following defendant's statement, defense counsel noted that she objected to the State's motion to exclude certain evidence. The court initially granted the motion without argument but allowed defense counsel to proceed after her request to explain her objection further. Defense counsel explained that "[t]he line of defense is that Ms. Locey was motivate[d] to make these charges by a desire to unlawfully take possession of [defendant's] property." The court responded: "There's nothing been charged. I'm not going to let it in."

¶ 8    At the jury trial, Locey testified that she was living in defendant's apartment on December 16, 2018, the date of the alleged offense. She had been living in defendant's apartment "[o]n and off" for four months and had her own apartment in the same building. Locey and defendant had been in a dating relationship for six months.

¶ 9    Locey and defendant were smoking crack cocaine together on the night in question. After consuming the crack cocaine, defendant and Locey wanted to procure more. Defendant invited his friend to the apartment. Locey stated that defendant wanted Locey to engage in sexual activity with the friend in exchange for more crack cocaine. Locey told defendant that she did not want to do that. Defendant became "very angry" and slapped Locey's face, knocking her to the ground.

¶ 10    Defendant's friend left the apartment. Locey began to pack her belongings, which, according to Locey, made defendant even angrier. Defendant yelled at Locey: "[Y]ou are not going nowhere." Locey testified that she sat on the bed, at which point defendant began repeatedly punching her in the head with closed fists. She begged defendant to stop, and he did so "after a few minutes."

¶ 11       Following the attack, defendant got undressed, lay on the bed, and forced Locey to perform oral sex on him. Afterward, Locey dialed 911 on her cell phone, and set the phone down. She then stressed to defendant that she needed to go to the hospital, but defendant again stated that Locey was "not going nowhere."

¶ 12       Locey eventually heard the footsteps and radios of approaching officers outside the apartment. When police knocked on the door, defendant put his hand over Locey's mouth and held a knife to her neck. Locey described what happened next:

> "The cops continued to knock on the door, pound louder. Something made [defendant] get up. He got up, stood up, and as soon as he did, I jumped out of the bed, went right around the corner of the kitchen, and opened the door and slid out into the hallway of the apartment."

Locey told the officers in the hallway that defendant had struck her and held a knife to her neck. She did not tell the officers about the crack cocaine because she did not want to go to jail. She also did not tell the officers about the forced oral sex because she was embarrassed.

¶ 13       Locey went to the hospital that night. She testified that she had a black eye and knots on her head from the attack. She also indicated that her left wrist was injured in attempting to block defendant's strikes. The State introduced into evidence six photographs taken of Locey on the night in question. The photographs appear to show bruising on Locey's temples and a bandaged left hand.

¶ 14       On cross-examination, Locey confirmed that she was a crack cocaine user. Defense counsel then asked: "Crack cocaine affects your perception of reality, correct?" The State objected without elaboration, and the court sustained the objection, also without explanation. Locey testified that she did not strike defendant on the night in question.

¶ 15    Justin Holmes of the Rock Island Police Department testified that he responded to a call at defendant's apartment on the night of December 16, 2018. Holmes was dispatched to that location in response to "an open line 911" call. He explained that an open line 911 call refers to a call during which there is no communication from the caller. Holmes entered the building and put his ear to the door of defendant's apartment. Holmes described what he heard: "I'm hearing a female along the lines of like: 'Let me go, please help me, help.' Things like that." Holmes also detected a male voice but could not understand what he was saying.

¶ 16    Holmes knocked on the door and announced himself as a police officer. He continued to hear the female voice asking for help. Locey then ran out of a second door to the apartment and into the hallway. Holmes continued: "That's when I asked [Locey] who else is in the apartment, what's going on? And she's very, very frantic. She starts screaming he has a knife, he has a knife."

¶ 17    Holmes requested police backup, then called into the apartment, ordering defendant to exit. Defendant refused. Later, Holmes and several other officers entered the apartment and discovered defendant in a bedroom. Defendant was taken into custody. Holmes found and collected a knife from the bedroom, located "right at [defendant's] feet when we took him into custody."

¶ 18    Holmes spoke with Locey again after defendant was taken into custody. Locey remained very distraught. Holmes observed that there were a number of lumps on Locey's head, and that the lumps appeared to be growing in size during their conversation. Holmes testified: "As I was talking to her, it was just literally growing bigger and bigger and bigger, which led me to believe that everything she was telling me was *** correct." Prior to the final word of that statement, defense counsel raised an objection, arguing that it was improper for Holmes to comment on the credibility of another witness. The court overruled the objection, adding: "It was his judgment. He was there."

5

¶ 19        Daniel Johnson of the Rock Island Police Department testified that he arrived at defendant's apartment after Holmes. From outside the apartment, Johnson "could hear a female crying and also indicating let me go." After Johnson and Holmes announced their presence, Locey ran out of an adjacent door. Johnson described her as "crying frantically and upset." Johnson and other officers later took defendant into custody in the bedroom of the apartment.

¶ 20        Defendant testified in his own defense. He stated that when he and Locey consumed the entirety of their crack cocaine on the night in question, Locey told him he should purchase more. Defendant did not want to spend the last of his money on drugs. Defendant eventually told Locey to leave the apartment. Locey then "started talking crazy." Locey told defendant that she had nowhere to go, but defendant indicated that he did not care.

¶ 21        Defendant described what happened next: "And then she got up and she hit me. So I started grabbing stuff to throw up at her and she hit me again. When I got arrested, I got—my face is swollen. That's why her hand is messed up. She's [*sic*] hit me. She hit me." When Locey was hitting defendant, he hit her back. Defendant then went to the bathroom to look at his face. He was in the bathroom when police arrived at the apartment door.

¶ 22        On cross-examination, defendant again explained that the police arrived while he was in the bathroom. The following colloquy ensued:

> "[THE STATE]: [D]id you tell the officers that that night when they asked you what happened?
>
> [THE DEFENDANT]: They didn't ask me nothing. They just—
>
> [THE STATE]: When they asked you what happened, did you tell them that?
>
> [THE DEFENDANT]: They didn't ask me nothing."

6

After a sustained objection to a nonresponsive answer from defendant, the colloquy continued:

"THE COURT: So she asked you, did you tell the officers—

THE DEFENDANT: I didn't get to tell no one.

THE COURT: Yes or no?

THE DEFENDANT: No.

THE COURT: Your responses will be yes or no, [defendant].

[THE STATE]: Did you tell the officers about any of this interaction? That the people came over? That there was this fight over the drugs or that you had to go to the bathroom? Did you tell the officers any of that? Yes or no, [defendant]?

[THE DEFENDANT]: No. I didn't get to explain nothing.

THE COURT: That will be stricken."

¶ 23    In closing arguments, defense counsel argued that the case amounted to "a he said/she said situation." In rebuttal, the State disagreed:

"[THE STATE]: This is the part where we have differences of opinion, again. And I don't see it as a he said/she said because she said to the officers what happened. He didn't say anything. Now—

[DEFENSE COUNSEL]: Your Honor, I would object and ask that that be stricken.

[THE STATE]: That was his testimony on the stand. He chose not to tell them.

[DEFENSE COUNSEL]: He wasn't obligated to.

7

THE DEFENDANT: I didn't say anything because I didn't get a chance to talk.

THE COURT: She's arguing that he did not make a statement to the police, so *** [o]verruled."

The jury found defendant guilty on both counts of domestic battery and not guilty of aggravated unlawful restraint.

¶ 24    Following a sentencing hearing, the court imposed a sentence of five years' imprisonment. The written sentencing order shows that sentence was imposed on both domestic battery charges.

¶ 25                                    II. ANALYSIS

¶ 26    On appeal, defendant raises seven total contentions of error. Of the seven claims, defendant urges this court to review four under the rubric of plain error, as he failed to preserve them for review. The four alleged plain errors are: (1) the circuit court erred in barring impeachment evidence and cross-examination related to Locey's motivation for providing false testimony; (2) the court erred in preventing defendant from cross-examining Locey regarding her use of drugs; (3) the court erred in allowing the State to offer testimony from Holmes bolstering Locey's credibility; and (4) the State made repeated improper references to defendant's postarrest silence.

¶ 27    The plain error test provides a framework under which a reviewing court may consider claims of error not properly preserved by a defendant. The first step in any plain error analysis is to determine whether a clear, obvious, or plain error was committed. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Where such an error was committed, defendant bears the burden of proving that the error was prejudicial, and thus, reversible. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 28    A defendant seeking to demonstrate reversible plain error may do so in either of two ways. Under the first prong of the plain error doctrine, an error will be deemed reversible where the

8

evidence at trial was so closely balanced that the error threatened to tip the scales of justice against the defendant. *Piatkowski*, 225 Ill. 2d at 565. Under the second prong, a reviewing court will reverse where the error committed was so serious that prejudice must be presumed. *People v. Herron*, 215 Ill. 2d 167, 185 (2005). Reversible error under the second prong of the plain error doctrine has been equated with the concept of "structural error." *People v. Clark*, 2016 IL 118845, ¶ 25. Structural error has been defined as "a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the [proceedings].' " *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (quoting *Herron*, 215 Ill. 2d at 186). A structural error, whether preserved or unpreserved, mandates automatic reversal. *People v. Stoecker*, 2020 IL 124807, ¶ 23; *Thompson*, 238 Ill. 2d at 608.

¶ 29    Defendant argues that each of the four alleged errors is individually reversible under the first prong of the plain error doctrine because the evidence in the case was closely balanced. He also argues that the four errors cumulatively rendered his trial so fundamentally unfair that automatic reversal is required. We begin by considering the claims of error.

¶ 30                    A. Clear or Obvious Error

¶ 31                1. Locey's Motivation to Testify Falsely

¶ 32    Defendant argues that the circuit court erred in granting the State's motion to bar the defense from introducing evidence at trial relating to "[p]rior contacts or other untried charges relating to the victim." While the State did not identify that evidence with any specificity in the motion itself, defendant provided those details at the hearing on the motion. Specifically, defendant asserted that Locey had lived in his apartment and stolen his belongings during his previous stint in jail. Additionally, he asserted that Locey had recently been evicted from her own apartment and was currently living in his apartment during his continued detention. Defense counsel explained

9

that that testimony would allow her to argue that Locey was motivated to fabricate her testimony in order to keep defendant in jail and gain possession of his property.

¶ 33    The credibility of a witness may be attacked by any party. Ill. S. Ct. R. 238(a) (eff. Apr. 11, 2001); Ill. R. Evid. 607 (eff. Jan. 1, 2011). "[C]ross-examination to show bias, interest, or motive to testify falsely is a matter of right." *People v. Triplett*, 108 Ill. 2d 463, 475 (1985). The circuit court has no discretionary power to deny the defendant this right. *Id.* When a party presents impeachment evidence for this purpose, that evidence "must give rise to an inference that the witness has something to gain or lose by his testimony. Accordingly, the evidence must not be remote or uncertain." *People v. Coleman*, 206 Ill. 2d 261, 278 (2002).

¶ 34    The State argues that the court properly barred evidence relating to Locey's prior acts because Locey's statement and the accompanying police report were nothing more than "defendant's unsupported, self-serving accusations." The State concludes that the impeachment evidence sought to be introduced by defendant was "entirely uncertain."

¶ 35    The State's argument reflects a misinterpretation of the legal rule that impeachment evidence not be remote or uncertain. See *id.* That rule, previously announced in *Triplett*, 108 Ill. 2d at 476, and *People v. Bull*, 185 Ill. 2d 179, 206 (1998), does not require that the impeachment evidence itself be credible or certain. See *People v. Bradford*, 106 Ill. 2d 492, 499 (1985) ("The purpose of impeaching evidence is to destroy the credibility of a witness and not to establish the truth of the impeaching evidence."). Rather, the rule requires that the impeaching evidence be sufficiently capable of giving rise to a nontenuous, nonremote inference that the witness has a motivation to testify falsely.

¶ 36    For instance, in *Bull*, the circuit court barred the defendant from cross-examining the State's DNA expert regarding administrative disciplinary charges levied against him for stealing

10

a microscope. *Bull*, 185 Ill. 2d at 205. Before our supreme court, the defendant argued that the ruling was erroneous because the expert's "poor standing increased the risk that negative critiques of his job performance, such as from the defense DNA expert, would cause him to be fired," and thus he was strongly motivated to testify in a biased manner in defense of his performance. *Id.* The supreme court affirmed the decision of the circuit court, finding that "[t]he record is too speculative and remote to infer that [the expert] had something to gain or lose by his testimony." *Id.* at 207. Notably, the court's analysis focused solely on the remoteness of the connection between the evidence and the expert's purported motivation to testify falsely. At no point did the court consider the substantive credibility or veracity of the underlying charges against the expert.

¶ 37        Similarly, in *Triplett*, the court considered proposed impeachment evidence showing that a State's witness had multiple contacts with police as a juvenile. *Triplett*, 108 Ill. 2d at 473. The defendant had unsuccessfully argued before the circuit court that the witness's contacts with police demonstrated his motive to provide biased testimony. *Id.* Specifically, the defendant proposed that the contacts with police tended to demonstrate that the witness's motive to cooperate with the police was for his own benefit. *Id.* at 476. The supreme court also rejected that argument, finding that the witness's prior police contacts, other than those relating to his custody at the time of his testimony, were "too remote, uncertain and speculative to be admissible. These 'contacts' do not give rise to an inference that [the witness] had something to be gained or lost by his testimony." *Id.* at 477. As in *Bull*, the court gave no consideration to whether the evidence of prior contacts was accurate or credible. Instead, it only found that the inferential connection between those contacts and the witness's purported motive to testify falsely was too tenuous.

¶ 38        In the instant case, the inference to be drawn from defendant's proposed testimony to Locey's motivation to testify falsely is not remote or uncertain. According to defendant, Locey

11

stole his property during his prior stint in jail and was currently living without permission in his apartment after being evicted. From these proposed facts, it may be reasonably inferred that Locey would be motivated to provide testimony that would result in defendant's continued incarceration. Of course, this means only that defendant met the baseline threshold for admissibility of his impeachment evidence. Whether defendant's testimony on that point was credible would ultimately be a question for the trier of fact. See, *e.g.*, *People v. Perez*, 202 IL App (1st) 153629-B, ¶ 31. However, the circuit court's decision preventing that evidence from even being presented to the jury amounts to a clear and obvious error.

¶ 39                                        2. Locey's Drug Use

¶ 40        Defendant next argues that the circuit court erred in sustaining the State's objection when defense counsel asked Locey whether crack cocaine affected her perception of reality.

¶ 41        Our supreme court "has held that drug addiction of a witness at the time of testifying or at the time that an event occurred is a proper subject of cross-examination and may be used in an attempt to diminish a witness' credibility." *People v. Kliner*, 185 Ill. 2d 81, 130 (1998); see also, *e.g.*, *People v. Foster*, 322 Ill. App. 3d 780, 789 (2000) ("Parties must be allowed to cross-examine witnesses regarding drug use[.]"); *People v. Iniguez*, 361 Ill. App. 3d 807, 815 (2005) ("[P]arties are entitled to cross-examine witnesses about drug use[.]"). Evidence of a witness's drug use "is a significant factor in evaluating witness credibility *** because it is particularly probative of the witness's abilities to perceive and recall accurately." *People v. Di Maso*, 100 Ill. App. 3d 338, 342 (1981). The latitude permitted in a cross-examination relating to a witness's drug use lies within the sound discretion of the circuit court. *Kliner*, 185 Ill. 2d at 130.

¶ 42        The State argues that it was well-established that Locey was a user of crack cocaine and had used it on the night in question. It further contends that the jury would have considered those

12

facts in assessing her ability to perceive the events in question. Thus, the State asserts that the circuit court was within its discretion in sustaining an objection to further questioning on the subject because any further cross-examination "would not have provided a significant impact in the jury's minds."

¶ 43      The State's argument implicitly relies upon the proposition that the jury could infer or assume some general level of perceptual impairment from Locey's drug use. Even assuming such an inference to be reasonable, the jury would be incapable of divining the precise impacts of crack cocaine on Locey's perception and memory. The State offers no argument explaining why defendant, in attacking Locey's credibility, should be obligated to rely solely on the assumptions and inferences of the jury.

¶ 44      To be sure, the circuit court retains discretion to prevent a party from introducing cumulative evidence. *E.g. People v. Tolliver*, 347 Ill. App. 3d 203, 227 (2004). "Evidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). Contrary to the State's assertion, cross-examination regarding the specific impacts of crack cocaine on Locey's perception and memory had the potential to put new, probative evidence before the jury. By eliciting testimony explaining how Locey herself was affected by crack cocaine, defendant would have put direct evidence, bearing on Locey's credibility, in front of the jury, rather than being forced to rely upon the jury's inferences and assumptions about drug users. We therefore conclude that the circuit court abused its discretion and committed clear and obvious error in preventing defendant from pursuing this line of questioning.

¶ 45                    3. Improper Bolstering of Locey's Testimony

13

¶ 46    Defendant further argues that the circuit court erred in allowing Holmes to testify that the swelling on Locey's head led him to believe that she was telling him the truth about being attacked by defendant. Defendant maintains that this testimony amounted to an improper bolstering of Locey's credibility at trial.

¶ 47    Because the credibility of a witness is a question to be resolved by the trier of fact, it is generally improper for one witness to comment upon the credibility of another witness. *People v. Becker*, 239 Ill. 2d 215, 236 (2010). In *People v. Brothers*, 2015 IL App (4th) 130644, ¶ 124, a police officer testified of the victim: "She was still in shock. I mean it was just a very blank stare. She was scared, you know, talking about it, still trembling but very believable, very credible." The Fourth District found that testimony to be clear and obvious error, noting the " '*fundamental rule* that one witness should not be allowed to express his opinion as to another witness's credibility.' " (Emphasis in original.) *Id.* ¶ 125 (quoting *People v. Henderson*, 394 Ill. App. 3d 747, 754 (2009)). The *Brothers* court further commented that the fact that the officer's testimony was not explicitly invited by the prosecutor's preceding question had no impact on its analysis. *Id.* ¶ 126.

¶ 48    In the present case, the State argues that the portion of Holmes's testimony in question was not offered as a comment on Locey's credibility. Rather, the State asserts that Holmes's testimony was "a comment about the ongoing situation in and around defendant's apartment." The State continues:

> "Locey had told [Holmes] and the other officers that defendant was inside with a knife, not coming out. At that time, clearly, the police needed to determine how to proceed. Their safety was at risk. The State submits that Holmes's comment was confirming that they only went into the apartment to apprehend defendant because

14

Locey's wounds had essentially confirmed that he had attacked her and needed to be arrested."

¶ 49　　The State's argument fails on two fronts. First, Holmes's statement that he believed Locey to be telling the truth about defendant's attack was, unequivocally, a comment upon Locey's credibility. The State has provided no authority suggesting that Holmes's intent in making that statement is of any particular relevance to our analysis. In any event, the State's argument also places Holmes's testimony in an incorrect context. The record clearly shows that the interaction in which Holmes noticed Locey's worsening injuries occurred *after* defendant had been placed in custody. See *supra* ¶ 18. Thus, that testimony could not have been offered as an explanation as to why Holmes and other officers entered the apartment to arrest defendant. The circuit court committed clear and obvious error in overruling defense counsel's objection to Holmes's testimony, thereby allowing Holmes to bolster Locey's credibility.

¶ 50　　　　　　　　　　　　　　　4. Postarrest Silence

¶ 51　　Finally, defendant argues that the State improperly impeached his testimony through reference to his postarrest silence.

¶ 52　　In *Doyle v. Ohio*, 426 U.S. 610, 618 (1976), the United States Supreme Court held that where a defendant receives *Miranda* warnings following his arrest, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." After *Doyle*, our supreme court held that the use of a defendant's postarrest silence at trial is error regardless of whether *Miranda* warnings were delivered:

> "The *Miranda* warnings do not confer rights on a defendant; they merely advise a defendant, who may be ignorant or intimidated, that he possesses such rights. Since

15

every arrested person has the right to remain silent and may be aware of this right even in the absence of *Miranda* warnings, post-arrest silence remains 'insolubly ambiguous.' " *People v. Beller*, 74 Ill. 2d 514, 521 (1979) (quoting *Doyle*, 426 U.S. at 618)).

See also *People v. Clark*, 335 Ill. App. 3d 758, 763 (2002) ("[U]nder Illinois evidentiary law, it is impermissible to impeach a defendant with his or her postarrest silence, regardless of whether the silence occurred before or after the defendant was given *Miranda* warnings.").

¶ 53    The State concedes that clear or obvious error was committed here. There is no question that the State asked defendant about his postarrest silence, then invoked that silence again in its rebuttal argument. Both the State's questions and its later commentary amounted to clear and obvious error.

¶ 54                                B. Prejudice

¶ 55    Having found that four clear and obvious errors were committed at defendant's trial, we must next consider whether any or all of those errors entitles defendant to relief. Defendant argues that the errors are reversible under either prong of the plain error test. We find that the errors in question combined to erode the integrity of the judicial process and undermine the fairness of defendant's trial, such that they cumulatively require reversal under the second prong of the plain error test.

¶ 56    Our supreme court has explained that

"[W]hen an error arises at trial that is of such gravity that it threatens the very integrity of the judicial process, the court must act to correct the error, so that the fairness and the reputation of the process may be preserved and protected. Critically, the court will act on plain error *regardless* of the strength of the evidence

16

of defendant's guilt." (Emphasis in original.) *People v. Blue*, 189 Ill. 2d 99, 138 (2000).

Errors of such magnitude are structural errors. *Glasper*, 234 Ill. 2d at 197-98 ("[A]utomatic reversal is only required where an error is deemed 'structural,' *i.e.*, a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the defendant's trial.' " (quoting *Herron*, 215 Ill. 2d at 186)). Where structural errors are not preserved, they are subject to reversal under the second prong of the plain error test. *Thompson*, 238 Ill. 2d at 613-14.

¶ 57 Even where no single error is alone so serious as to be deemed a structural error, an accumulation of such errors may nevertheless create a pervasive pattern of unfair prejudice in a trial, such that automatic reversal is warranted. *Blue*, 189 Ill. 2d at 139. We find that the four plain errors in this case rise to such a level.

¶ 58 Our supreme court has held that a comment upon a defendant's postarrest silence, "while improper, is not an error of such magnitude as to clearly deprive the defendant of a fair trial." *People v. Herrett*, 137 Ill. 2d 195, 215 (1990). That such an error alone does not itself rise to the level of structural error, however, is not to say that the error is not serious. Indeed, in the present case, the clear or obvious error in referencing defendant's postarrest silence may be better viewed as a series of compounding errors.

¶ 59 Error was originally committed when the prosecutor asked defendant if he had relayed his version of events to police upon his arrest. When defendant began to explain why he had not done so, the prosecutor cut him off and asked him again whether he had spoken to police. The improper reference to defendant's postarrest silence was magnified when the court became involved in the cross-examination. The court asked defendant whether he had said anything to the police, then

17

twice insisted that defendant answer only by saying yes or no. The prosecutor concluded the extended exchange by asking again whether defendant had remained silent after his arrest.

¶ 60    The improper line of questioning was then highlighted specifically in closing argument. Defense counsel argued in closing that the case was "a he said/she said situation." In rebuttal, the State disagreed, asserting that Locey was more credible because she told her story to police while defendant did not. This argument drew an objection, leading the State to point out, this time to the court, that "he chose not to tell them." Thus, the State made its improper argument explicit in attempting to impeach defendant's credibility through his own postarrest silence. Finally, the court exacerbated that error by seemingly endorsing that line of argument, stating: "She's arguing that he did not make a statement to the police***."

¶ 61    These errors were not only clear and obvious, but egregious. The State did not make a passing reference to defendant's postarrest silence or ask a single innocuous question about it in cross-examination. It engaged in an extended improper exchange in cross-examination then explicitly argued that defendant's postarrest silence rendered him less credible. The court compounded these errors first by itself engaging in examination of defendant regarding his postarrest silence, then by endorsing the State's rebuttal argument in overruling defense counsel's objection in front of the jury.

¶ 62    The evidence at defendant's trial, at bottom, amounted to a contest between Locey's version of events and defendant's.[1] Serious error was committed in allowing the State to impeach defendant's credibility through his postarrest silence. Troublingly, the three other clear and obvious errors we have identified each resulted in an improper impact on the jury's credibility determination as well. The court erroneously prevented defendant from attacking Locey's

---

[1]Whether this credibility contest was a particularly *close* one is outside of the scope of this analysis.

credibility by barring evidence that would give rise to an inference that she was motivated to testify falsely. Further, the court improperly prevented defendant from attacking Locey's credibility through questions about the effects of her drug use. Counter to these improper limitations, the court erred in allowing Holmes to *bolster* Locey's credibility through his testimony.

¶ 63    We find that this series of errors amounts to the pervasive pattern of unfair prejudice contemplated in *Blue*. *Blue*, 189 Ill. 2d at 139. Such a number of serious errors fundamentally undermines the fairness of the proceedings and threatens the integrity of the judicial process. See *Glasper*, 234 Ill. 2d at 197-98. Relief must be granted "*regardless* of the strength of the evidence of defendant's guilt." (Emphasis in original.) *Blue*, 189 Ill. 2d at 138. Accordingly, we vacate defendant's convictions and remand the matter for further proceedings. We need not address defendant's remaining claims.

¶ 64                                    III. CONCLUSION

¶ 65    The judgment of the circuit court of Rock Island County is vacated and the cause is remanded.

¶ 66    Judgment vacated.

¶ 67    Cause remanded.

¶ 68    JUSTICE SCHMIDT, specially concurring:

¶ 69    I concur in the judgment.