**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180517-U

Order filed November 30, 2021

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Putnam County, Illinois, |
| Plaintiff-Appellee, | ) | |
| | ) | Appeal No. 3-18-0517 |
| v. | ) | Circuit No. 16-CF-3 |
| | ) | |
| CLIFFORD A. ANDERSEN, JR., | ) | Honorable |
| | ) | Stephen A. Kouri, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE WRIGHT delivered the judgment of the court.
Justice O'Brien concurred in the judgment.
Presiding Justice McDade concurred in part and dissented in part.

**ORDER**

¶ 1    *Held*:  Defendant's convictions are affirmed where defendant received effective assistance of counsel and a fair trial.

¶ 2    Following a jury trial, defendant was convicted of concealment of a homicidal death and first degree murder. In this direct appeal, defendant argues he received ineffective assistance of counsel regarding his speedy trial rights and the improper admission of irrelevant evidence.

Alternatively, defendant argues he was deprived of a fair trial due to cumulative error. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                    A. 2016 Procedural Events Relevant to Speedy Trial

¶ 5        Clifford Andersen Jr. (defendant) was arrested on September 12, 2016, and remained in custody for the duration of the circuit court proceedings. On September 15, 2016, the State charged defendant by information with concealment of a homicidal death pursuant to section 9-3.4(a) of the Criminal Code of 2012 (Code). 720 ILCS 5/9-3.4(a) (West 2016). During defendant's arraignment before Judge McCuskey that same day, defendant informed the circuit court that he wished to retain private counsel. The circuit court indicated to defendant that the matter would be continued for a status hearing on October 13, 2016, to determine whether defendant was able to retain private counsel. The circuit court's written order, dated September 15, 2016, provided that the "continuance is attributed to defendant's delay for purposes of obtaining counsel." Defendant did not object to the October 13, 2016, date set by the court.

¶ 6        Defendant secured private counsel within one week when, on September 22, 2016, private counsel first appeared before the court on defendant's behalf. At this time, defense counsel requested the circuit court to set aside the October 13, 2016, status hearing date. Next, the court stated "[w]e vacated October 13th. So the — and you have no objection to a preliminary hearing date a little farther out, [defense counsel]?" Defense counsel responded "[n]o, your Honor," and the court scheduled the preliminary hearing for November 29, 2016. The circuit court stated that, alternatively, a grand jury could convene, after which time defendant would enter his formal plea.

2

¶ 7    Following Judge McCuskey's discussion with defense counsel on September 22, 2016, the grand jury was convened the day before the scheduled preliminary hearing. The grand jury returned a true bill of indictment against defendant. Therefore, a preliminary hearing was not necessary on November 29, 2016. The State charged defendant by indictment with concealment of a homicidal death pursuant to section 9-3.4(a) of the Code. On November 29, 2016, defendant was present in court with private counsel and entered a plea of not guilty. Defendant requested a jury trial. The circuit court then discussed defendant's motion for discovery and the amount of time the prosecutor would need to respond to defendant's motion. The parties informed the court that they had reached an agreement on dates for production of discovery by both sides. The parties also reached an agreement for the jury trial to be scheduled for May 8, 2017. At this time, defense counsel indicated that defendant was waiving his speedy trial rights and agreed to a May 8, 2017, trial date. The circuit court then directed a question at defendant to be certain defendant did not desire to assert his speedy trial right. The court stated, "[a]nd you also agree with your counsel that you're waiving the right to a speedy trial so that you can obtain that date even though you're in custody; is that correct?" Defendant responded affirmatively.

¶ 8                    B. 2017 Procedural Events Relevant to Speedy Trial

¶ 9    On April 13, 2017, the parties appeared before Judge Keith. The parties informed Judge Keith that they agreed to reschedule the May 8, 2017, jury trial date to a later date, October 16, 2017. At this time, the following exchange occurred:

>    "THE COURT: At 9:00 a.m. All right. So pretrial motions would be filed by May
>    8th [2017,] the motions to be heard on July 6th, [2017,] 2:00 p.m., and then we're going
>    to vacate the May 8th jury trial currently set and reset the jury trial for October 16th,
>    2017, at 9:00 o'clock. [Defense counsel]?

3

[DEFENSE COUNSEL]: That is correct, your Honor.

THE COURT: Okay. All right. And then so the motion for application for media coverage is granted by agreement of the parties."

¶ 10     On August 17, 2017, the parties discussed that Judge Keith was being rotated out of Putnam County at the end of 2017 and that Judge Kouri would be rotated into Putnam County in 2018.[1] The parties indicated it would be best for Judge Kouri to decide the numerous pretrial motions. In addition, the report of proceedings contains the following exchange between the court and the parties, wherein various issues related to the pending pretrial motions, the progression of discovery, and other matters was discussed:

"[DEFENSE COUNSEL]: That's correct. Then last year we filed a motion for a list of witnesses. I was compelled to do that because I think the State has probably interviewed a hundred people in this case, and the discovery is enormous. And frankly, to expedite matters including, you know, our trial planning for how long the trial is going to take and that type of consideration, we are going to agree on a list of witnesses that will be submitted later. They are still working on it. In fact, they have more discovery apparently. They have just advised me today and yesterday.

THE COURT: Okay.

[THE STATE]: Judge, our suggested date that would be by agreement would be September 14th. If we could come back on that date."

¶ 11     On September 14, 2017, the parties appeared before Judge Keith and stated on the record that they agreed to strike the October 16, 2017, jury trial date and set the jury trial for May 7,

---

[1]During the hearing on August 17, 2017, the court granted defendant's motion to bar the testimony of defendant's wife, Diane, to the extent that Diane would not be called regarding any conversation made in confidence.

2018. The parties advised the court that they had reached an agreement to continue the jury trial to May 7, 2018, due to ongoing scheduling difficulties. In support of the request to remove the matter from the jury call in October 2017, defense counsel stated on the record as follows:

"[DEFENSE COUNSEL]: I don't think either counsel noted, we received what has been several thousand pages of discovery just today, and apparently more is coming, which is not in the record yet, so I thought I should mention that as well.

[DEFENSE COUNSEL]: It is relevant to the reason for the extension.

THE COURT: Okay. And I find this totally appropriate in the interest of justice for those reasons, just the amount of discovery and the motions that we anticipate to be coming forward before the Court as this case proceeds.

So we will do that. We will strike the jury setting for October 16th, and we will set this matter for jury on May 7th, 2018 at 9:00 o'clock in the morning until further order of the Court. And the next motion hearing will be November 9th, 2017 at 1:00 o'clock.

[DEFENSE COUNSEL]: Judge, all of that is accurate."

¶ 12     On November 9, 2017, defendant and defense counsel appeared before the court and scheduled an agreed date for pending motions to be heard by Judge Kouri on January 25, 2018. In addition, the court informed defendant that the grand jury had reconvened and issued a superseding indictment charging defendant with one count of concealment of a homicidal death pursuant to section 9-3.4 of the Code (720 ILCS 5/9-3.4 (West 2016)) (count I) and one count of first degree murder pursuant to section 9-1(a)(1) of the Code (725 ILCS 5/9-1(a)(1) (West 2016)). (count III).[2] Count I alleged that defendant committed the offense of concealment of a homicidal death where, on or about September 8-12, 2016, defendant, with knowledge that the

_____

[2]The grand jury did not return a true bill of indictment on count II.

5

victim had died by homicidal means, concealed the death of the victim by burying her body. Count III alleged that defendant committed the offense of first degree murder where, on or about August 22-23, 2016, defendant, without justification, struck the victim in the head with an object, knowing such an act created a strong probability of death or great bodily harm, thereby causing the death of the victim.

¶ 13                          C. 2018 Procedural Events Relevant to Speedy Trial

¶ 14          On January 25, 2018, the parties confirmed that they were in agreement that the jury trial court remain set for May 8, 2018. (R62) The following exchange between court and counsel on January 25, 2018, is set forth below:

> "[THE STATE]: So it sounds like we will be back on March 15th at 1:30. That date is by agreement between the parties to complete argument on the financial motion.
>
> THE COURT: All right. For my benefit, we are still on target for trial in May?
>
> [THE STATE]: Yes. May 8th I believe is our trial date, yes.
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: I'm sorry, your Honor. You're confirming the trial date in May?
>
> THE COURT: Yes, for now.
>
> [DEFENSE COUNSEL]: No, I agree. There had actually been a request by me to Judge Keith that maybe we can move it up, and we all foresee that is never going to happen. We're still getting discovery on this case.

THE COURT: I guess that's kind of what I was wondering."

¶ 15                    D. 2018 Verbal Speedy Trial Demand by Defense Counsel

¶ 16        During a conference call with the court and the parties that took place on April 16, 2018, the State informed the court that the State would like to delay the May 7, 2018, trial date until July 2018, stating:

> "[w]e will be prepared on a July date. And if everything from September 22nd, 2016, if everything from that point on is by agreement, then we have enough time under the speedy trial statute for this case to go over defense objection and have it specially set in July"

The prosecutor explained the basis for the State' requested continuance by stating:

> "There are over 50 witnesses in this case, and depending on the Court's ruling on the financial issues, close to 75 or 80 witnesses who will be testifying. We need to get them subpoenaed. We need to get them prepared. And we will abide by whatever you rule, Judge, but I think if [defense counsel] can represent that everything from September 22nd on of 2016 has been by agreement, then we would vigorously suggest that a July date is appropriate."

Defense counsel objected to the continuance and answered ready for trial on May 7, 2018.

¶ 17        During a hearing three days later, on April 19, 2018, the State again addressed any speedy trial concerns by advising the court as follows:

> "From September 22nd on, I believe every date has been by agreement, which means of the 120 days the State has to bring [defendant] to trial, we have used in that case approximately 13."

7

After explaining to the court that the delay attributable to the State, by the State's calculations, totaled 13 days, the prosecutor said:

"So, in light of that, Judge, we would ask for a continuance, either to a date in June that accommodates defense counsel or July 9th which sounds like it is a date good for everyone. But the first step is, is there agreement between the parties that these continuances from September 22nd on has been by agreement? If they are, that's how much time is off the clock."

Defense counsel responded, "[i] would agree with that," then stated:

"[a]nd the reason is strategic. We didn't want two trials, and that's what would have happened. We talked about that previously, and it made no sense, first of all, but also from our standpoint it would be a dress rehearsal for the State. So for that reason we did waive speedy trial for a period of time, but we are certainly on record now wanting to invoke that."

During this discussion, the State also made the following statement on the record:

"Judge, based on counsel's representations, it will be my calculation 80 days from today coupled with the 13, that's 93. So we would be on the 93rd day of the 120 day speedy trial period, well within the period. We will block off two weeks. I will get somebody else to cover my murder case in Danville. We will try this case, Judge."

Following the prosecutor's statement, the court asked defense counsel whether defense counsel disputed the prosecutor's calculation that if the trial took place on July 9, 2018, defendant would have received a speedy trial from the date of the speedy trial demand in April of 2018. The following exchange between the court and defense counsel:

"THE COURT: Are you — do you dispute his day calculation?

8

[DEFENSE COUNSEL]: No."

¶ 18　　　Following this confirmation by defense counsel, the court continued the trial date to July 9, 2018.

¶ 19　　　　　　　E. Pretrial Motions Relevant to the Issues Raised on Appeal

¶ 20　　　On July 13, 2017, defense counsel filed a motion to bar the contents of all private conversations between defendant and his wife, Diane, pursuant to spousal privilege. In opposition, the State filed a motion to admit defendant's statements to Diane and to admit evidence of Diane's observations of defendant on September 7, 2016, which she conveyed to a family member. Following the hearing conducted on January 25, 2018, the court ruled that Diane's personal observations of defendant on September 7, 2016, were admissible. However, the court reserved ruling on the admissibility of Diane's statements concerning defendant's search for the victim by horseback.

¶ 21　　　On December 1, 2017, defense counsel filed a motion to bar evidence of defendant and the victim's financial affairs at trial. The record indicates that the State considered this evidence crucial to establishing defendant's motive to commit the crimes. In the pretrial motion, defense counsel argued this evidence was "irrelevant, immaterial, and prejudicial." The circuit court conducted a hearing on defendant's motion *in limine*. The court denied defendant's motion except with respect to a handwritten note, which the court excluded for lack of foundation.

¶ 22　　　June 28, 2018, the State moved *in limine* to admit a recording of a September 26, 2016, phone call from jail between defendant and Melanie Zeitler. The State alleged that during the phone call, defendant asked Zeitler:

"[h]ow about my buddy Bob is he in there bragging about the money he got bragging about being the captain of security he used to be a security guard and he was bragging I can't tell you on the phone he can get himself in trouble f***ing shut up." The State argued before the court that this statement was admissible because it showed defendant was angry at Bob Hundt for speaking with the police. The court denied the State's motion to admit the recorded audio, reasoning that the statement was too vague to be relevant. The State asked if the recording could be admitted if Zeitler testified defendant was upset with Bob Hundt for speaking with the police. The court did not provide an answer.

¶ 23                          F. Jury trial (July 9, 2018)

¶ 24                                  1. Evidence

¶ 25        The evidence presented at trial established that the victim was last seen on August 22, 2016, and was reported missing the next day. The evidence also revealed that on August 22, 2016, defendant's friend, Bob Hundt, gave defendant a ride from the Denny's in LaSalle, Illinois, to a home in Standard, Illinois, because defendant claimed his vehicle had broken down. According to Hundt's trial testimony, when Hundt pulled up to the home, Hundt noticed defendant's vehicle in the driveway. Defendant told Hundt at that time that defendant's vehicle, a white Chevrolet SUV, had been repaired and returned to the driveway of the Standard home.

¶ 26        The next morning, a waitress at Denny's in LaSalle witnessed defendant park a vehicle in the Denny's parking lot, enter a different vehicle, and drive away. Later that morning, surveillance footage from the TA truck stop in Morris, Illinois, recorded a Buick Lacrosse entering the truck stop.

¶ 27        The same morning, defendant asked Hundt to pick him up at Romine's restaurant at the TA truck stop in Morris, Illinois. Surveillance footage placed defendant and Hundt at TA truck

10

stop around 10 a.m. that morning. According to Hundt's testimony, defendant told Hundt he obtained a ride to Romine's from a truck driver. Defendant also told Hundt not to tell the police they had been together in Morris that day. Defendant told Hundt to tell the police they were in Ottawa, Illinois.

¶ 28 According to Hundt, Hundt gave defendant a ride from the TA truck stop to Ladd, Illinois, because the victim, defendant's sister-in-law, was missing. When the men arrived at the victim's apartment in Ladd, defendant spoke with his wife and two police officers. Then, after defendant's conversation at the victim's residence, Hundt drove to the Flying J truck stop in LaSalle. Defendant told Hundt that defendant's vehicle had been repaired again, and that following those repairs, defendant's vehicle was dropped off at the truck stop in LaSalle.

¶ 29 The police interviewed defendant several days later after phone records confirmed defendant was the last person to speak with the victim. During the interview, defendant denied he had been to the TA truck stop on August 23, 2016. Instead, defendant claimed he and Hundt had been in Ottawa, Illinois, for the purpose of helping veterans.

¶ 30 On August 29, 2016, the victim's car was discovered in the parking lot of the TA truck stop in Morris. Defendant purportedly told Hundt, and another one of defendant's friends, Gaul, that two black men had stolen and/or were seen parking the victim's car at the TA truck stop.

¶ 31 In early September 2016, a high school student who mowed the lawn at 104 Fifth Street in Standard, Illinois, a vacant property defendant maintained for a friend, Maavich, noticed a mound of dirt covered in straw that did not previously exist on the property. In the days that followed, several neighbors and other persons observed defendant acting suspiciously while present at the 104 Fifth Street address.

¶ 32   On September 12, 2016, law enforcement officers discovered the victim's body buried in a shallow grave at 104 Fifth Street after receiving a report of a possible burial site covered in manure, hay, and branches. Bags of manure were discovered next to one of the garages on the property.

¶ 33   The police investigation established that defendant purchased 12 large bags of manure from a local Walmart on September 2, 2016, approximately one week after the victim was reported missing. Utilizing the bar codes on the bags discovered, a Walmart employee was able to match the bags of manure purchased on September 2, 2016, to those bags discovered at the property.

¶ 34   The State's evidence included motive evidence related to both defendant and the victim's source of income and spending habits. The evidence established that defendant was a retired teamster and was collecting disability benefits from the Department of Veteran's Affairs. Mary Manard, the general manager at Denny's, testified that the B & B gaming room and the Denny's restaurant were both located at the Flying J truck stop in LaSalle. Defendant was a regular customer at Denny's who would gamble daily at the B & B gaming room. According to Manard, defendant would often talk about his wins and losses with the staff at Denny's. Defendant was a generous tipper and once paid for a waitress's car repairs.

¶ 35   Melanie Popplewell, a server at Romine's Restaurant in the TA truckstop in Morris, testified that defendant frequently came into Romine's to have coffee. Popplewell considered defendant to be a nuisance.[3] Popplewell stated that defendant never seemed to have much money and once tipped her with a necklace and an earring. Popplewell saw defendant on a weekly basis and testified that she witnessed defendant panhandle throughout the day. After he stopped

---

[3]Defense counsel objected to any opinion testimony as to why defendant bothered Popplewell.

12

panhandling for the day, defendant spent those funds in the gambling room of the truck stop. If defendant won, he would return to the restaurant and purchase his dinner.

¶ 36        Misty Preuter, a former employee of Sun Loan Tax Service, testified that Sun loan provided high interest personal loans with interest rates from 53% and up. Preuter testified that defendant had obtained funds from the company over several years and always made his loan payments in a timely fashion. However, on August 22, 2016, the date the victim was last seen alive, Preuter spoke with defendant on the phone about a loan in the amount of $1,422, with an APR rate of 78.25%, because defendant had missed or was late with a payment on that loan.

¶ 37        The State's evidence established that defendant was married to the victim's sister, Diane. Diane testified for the defense and explained that the couple had a combined monthly income of approximately $6,000. The couple lived rent free in one of three properties owned by defendant's friend, Maavich. Defendant was the caretaker for Mavvich's other two properties, located at 104 Fifth Street and 204 Fifth Street in Standard.

¶ 38        Diane knew defendant had a loan at World Finance. However, Diane discovered after the criminal proceedings began that defendant had other loans. According to Diane, these loans totaled approximately $17,000. It also came as a surprise to Diane that defendant liked to play video poker. Diane also found out after her sister's death that defendant had been withdrawing approximately $5,000 per month from the couple's joint bank account. Diane described her sister, the victim, as frugal and very tight with her money.

¶ 39        The victim's adult son, Christopher, also described his mother as a very frugal person. Christopher testified that at the time of her death in 2016, his mother resided in a small, cluttered, apartment in Ladd and drove a 2007 Buick Lacrosse. Christopher testified that she would not spend money on herself or anything else, including clothing or vacations. Therefore, each time

13

Christopher and his mother dined together in a restaurant, Christopher paid for his mother's meal.

¶ 40    Thomas McClintock, the victim's first divorce attorney, testified that defendant had been very involved in the victim's divorce proceedings. The final judgment of dissolution was entered in 2006, but defendant felt the victim did not receive a fair share of the marital property. Due in part to defendant's persistence, in the form of frequent interactions with the victim's attorneys[4], the original judgment of dissolution was vacated after several years. A new judgment for dissolution, which included a marital settlement agreement which equitably distributed the marital assets, was entered in March 2011. The 2011 court order awarded the victim a percentage of her ex-husband's pension plans and a percentage of the sale of the marital home. Both attorneys involved in the dissolution proceedings described defendant's degree of involvement as unprecedented. Attorney Geiger described defendant as "more involved [in the divorce case] than probably anyone else I'd seen."

¶ 41    Brenda Jensen, an assistant branch manager at Eureka Savings Bank, testified that the victim opened an IRA at the bank in December 2011 by depositing two checks, one for $154,181.49, and the other for $24,839.68.[5] In January 2015, the victim's IRA account had a balance of $174,866.60. Shortly thereafter, in 2015, the victim began withdrawing money from her IRA at fairly regular intervals, and in the relatively consistent amounts of approximately $5,000. On one occasion, Jensen asked the victim about the purpose of these withdrawals, and the victim responded that "she was just helping someone out." The bank's records indicate that

---

[4]Robert Geiger testified that he began representing the victim in her pending dissolution proceedings in 2010.

[5]Jensen testified that the two checks deposited came from a pension fund. The IRA listed Diane Andersen, defendant's wife, as a contingent beneficiary.

14

withdrawals from the IRA account ceased in May 2016, by which time the account balance had been reduced to approximately $40,000.

¶ 42                    2. Defense Objections to the State's Evidence at Trial Relevant to
                     Defendant's Claims of Purported Cumulative Error on Appeal

¶ 43                                    a. Marital Privilege/Hearsay

¶ 44        Dena Guliano testified that on September 7, 2016, she received a text message from her aunt, Diane, informing Guliano that defendant told Diane that he had been horseback riding the entire day as part of the ongoing search for the victim.[6] Diane's text told her friend, Guliano, that defendant had not been horseback riding in the past 40 years and observed that defendant looked like "he**" when he returned home. In a later phone call between Guliano and Diane, Diane told Guliano that defendant "looked like "sh**," and smelled like "sh**t" when he arrived home on September 7, 2016.

¶ 45        Linda Leslie testified that during a text message exchange with Diane on September 7, 2016, Diane stated that "[defendant] was on a horse with some guys looking for [the victim]. [Defendant] doesn't ride horses and was, and it was too hot for him to be out there. He's okay, but he could have really gotten hurt himself [*sic*]."[7] According to Leslie, Diane stated that defendant went horseback riding with Jack Sims.

¶ 46        Shirley Soens testified that during a conversation with Diane at Soens's home on or about September 7, 2016, Diane told Soens that defendant went horseback riding and came home hot, sweating, and smelling like horse "s***".

¶ 47        Jack Sims testified that he had never gone horseback riding with defendant.

---

[6]Defense counsel's objection to this testimony was overruled where the State asserted the testimony was not offered for the truth of the matter asserted. A screenshot of the text message was admitted and published as People's exhibit No. 23.
        [7]The text message was admitted into evidence and published as People's exhibit No. 55 over defendant's objection.

                     b. Prior Bad Acts/Character Evidence

¶ 49        Illinois State Police Investigator Michael Galletti testified regarding his investigation of the victim's murder. Galletti's testimony established that after discovering the potential burial site at 104 Fifth Street in Standard, Galletti and his partner went to their vehicle to secure the scene until additional officers arrived to aid in the investigation. As Galletti observed the surrounding area, he noticed a white SUV canvasing the area as if it were observing and/or flanking the officers. Galletti believed he might be in danger, and the officers took cover. As the vehicle pulled closer to the scene, Galletti observed defendant as the driver, and instructed his partner to watch defendant's hands. On cross-examination, Galletti explained that he felt compelled to hide behind his engine block when defendant pulled up at the crime scene because Galletti had "heard stories that [defendant] was a Vietnam vet, that he has killed a lot of people." Defense counsel immediately objected, and the court simultaneously instructed the jury to disregard Galletti's comment.

¶ 50        Melanie Zeitler, who worked as a server at Denny's in LaSalle, testified that defendant Hundt were together at Denny's to have coffee almost daily. Zeitler was a close friend of defendant and spoke with defendant by telephone, from jail, on September 26, 2016. Defense counsel objected to the following question posed to Zeitler during her direct examination:

> "[a]nd in that conversation [defendant] said [defendant] was, this is what [defendant] told you on September 26, 2016, that Bob Hundt was bragging and [defendant] told you, I can't tell you on the phone but Hundt can get himself in trouble. He should f***ing shut up. That's what defendant said?"

¶ 51    Following a sidebar conference that immediately followed the objection, Zeitler answered the State's inquiry by merely indicating that defendant was upset and/or angry during the conversation.

¶ 52    G. Closing Arguments and Posttrial Motions

¶ 53    During closing argument, the prosecution asserted the testimony established that the victim told Jensen she was withdrawing money from her IRA to help "a friend." Following closing arguments, the jury found defendant guilty of concealment of a homicidal death and first degree murder. On August 16, 2018, defendant filed a motion for a new trial, raising claims of error concerning marital privilege and Galletti and Popplewell's testimony about defendant's character and/or prior bad acts. The circuit court denied defendant's motion on August 23, 2018. The same day, the court sentenced defendant to 60 years' imprisonment for first degree murder and five years' imprisonment for concealment of a homicidal death. Defendant appeals.

¶ 54    II. ANALYSIS

¶ 55    In this appeal, defendant argues that he received ineffective assistance of counsel because counsel failed to move for the dismissal of count I based on a violation of defendant's speedy trial rights and because counsel failed to object to improper motive evidence. Defendant further contends the cumulative effect of multiple errors, attributable to the court, trial counsel, and the State, deprived defendant of his right to a fair trial.

¶ 56    A. Ineffective Assistance of Counsel

¶ 57    1. Speedy Trial

¶ 58    Defendant argues that he received ineffective assistance of counsel because defense counsel failed to move for the dismissal of count I, concealment of a homicidal death, on speedy trial grounds. It is important to note that count I, concealment of a homicidal death, originally

17

arose from an information filed in September 2016. Defendant was indicted on the same charge in November 2016. Then, in November 2017, the grand jury returned another indictment, charging defendant with concealment of a homicidal death.

¶ 59        The State argues defendant agreed to delay and/or waived speedy trial from September 15, 2016, until May 7, 2018, and received a jury trial on count I well within the 120-day period prescribed by statute.[8] Thus, defendant's ineffective assistance claim pertaining only to count I fails where counsel had no cause to move to dismiss count I.

¶ 60        To demonstrate ineffective assistance of counsel on appeal, a defendant must show (1) that counsel's performance was deficient in that it fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326 (2011); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Where, a defendant's allegation of ineffective assistance is based on counsel's failure to move to dismiss a charge on speedy trial grounds, this court must consider only whether a motion to dismiss on speedy trial grounds, if filed, would have been meritorious. *People v. Isbell*, 2020 IL App (3d) 180279, ¶ 13.

¶ 61        Section 103-5(a) of the Code of Criminal Procedure of 1963 mandates that:

>        "[e]very person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant *** [d]elay shall be considered to be agreed

---

[8]Regarding speedy trial, on April 19, 2018, the State informed the court that by the State's calculations, at most, 93 days of delay were attributable to the State prior to the July 9, 2018, jury trial date. Defense counsel agreed with the State's calculation. On appeal, the State alleges that only 67 days of delay occurred.

to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record."[9] 725 ILCS 5/103-5(a) (West 2016).

¶ 62    Section 103-5(f) provides that "[d]elay occasioned by the defendant shall temporarily suspend for the time of the delay the period within which a person shall be tried as prescribed by [subsection] (a)." *Id.*, § 103-5(f).

¶ 63    Interestingly, the record documents that defense counsel knowingly and deliberately avoided making a demand for a speedy trial, as required by statute, until making his oral demand for on April 19, 2018. In fact, on April 19, 2018, defense counsel conceded that the delay attributable to the State up until April 19, 2018, totaled just 13 days. In addition, defense counsel recited his strategic reasons for agreeing to all delay up until April 19, 2018. Counsel explained that his agreement to all but 13 days of delay benefitted his client because defense counsel "didn't want two trials," and did not want the first trial to be a "dress rehearsal for the State."[10] For these reasons, defense counsel stated that "we did waive speedy trial for a period of time, but we are certainly on record now wanting to invoke that" for any delay after May 7, 2018.

¶ 64    On appeal, defendant does not take issue with the soundness of defense counsel's strategy to avoid multiple trials by agreeing to all procedural delay between September 22, 2016, and May 7, 2018.[11] Nor does defendant dispute that he waived speedy trial from November 29, 2016, until May 7, 2018. Instead, defendant urges this court to ignore defendant's expressed trial

---

[9]It is undisputed that the 120-day period prescribed in section 103-5(a) applies to defendant where defendant remained in custody for the entirety of the pretrial proceedings.

[10]Though not stated specifically, counsel's reference to avoiding multiple trials stemmed from the fact that defendant was indicted in 2016 for the offense of concealment of a homicidal death, based on acts that occurred after the victim's death. However, the State did not convene a grand jury or receive a bill of indictment accusing defendant of separate acts constituting first degree murder until November 2017.

[11]During oral argument, counsel for defendant conceded that the disputed time period pertaining to defendant's speedy trial claim runs from September 22, 2016, through May 7, 2018, not September 15, 2016, through May 7, 2018, as stated in defendant's brief.

19

strategy and his agreement that the speedy trial period began to toll on September 22, 2016.

Defendant now argues he did not agree to the delay that occurred from September 22, 2016, until a preliminary hearing was scheduled to take place on November 29, 2016.

¶ 65        Defendant, citing *People v. Uryasz*, 32 Ill. App. 3d 825 (1975), asserts that the time between defendant's arraignment and the preliminary hearing date cannot be attributable to the defendant, regardless of whether defendant agrees to the preliminary hearing date. In *Uryasz*, this court held that the defendant's agreement to set a preliminary hearing date did not constitute delay occasioned by defendant where the preliminary hearing date was set by the court, and "[the defendant] merely agreed to the date and did not seek a delay in holding the preliminary hearing." *Id.*, at 827.

¶ 66        However, *Uryasz* is distinct from the instant case for two reasons. First, as the State points out, in 1999, Public Act 90-705 amended section 103-5(a) by adding the language that "[d]elay shall be considered to be agreed to by the defendant unless he or she objects to the delay by making a written demand for trial or an oral demand for trial on the record." Pub. Act 90-705 (eff. Jan. 1, 1999) (amending 725 ILCS 5/103-5(a)). Accordingly, the *Uryasz* decision was rendered based on prior statutory language that does not apply here. Second, unlike the instant case, the defendant in *Uryasz* filed a speedy trial demand at the time of his arraignment, prior to the court scheduling the defendant's preliminary hearing. In contrast, this defendant informed the court that he was asserting a waiver of his right to speedy trial, with full knowledge of the existence of his right to a speedy trial within a 120-day deadline.

¶ 67        Furthermore, our supreme court has rejected the argument raised in defendant's reply brief that, for purposes of delay under section 103-5(a), agreeing to set a preliminary hearing date in the future differs from a request for a continuance or delay of a preliminary hearing. In

*People v. Cordell*, 223 Ill. 2d 380, 388-90 (2006), our supreme court held that the plain language of section 103-5(a) did not require that the delay be predicated on a set trial date. "Rather, [section 103-5(a)] provides only a starting point—the date custody begins, and an ending point—120 days later. Any action by either party or the trial court that moves the trial date outside of that 120—day window qualifies as a delay for purposes of section [103-5(a)]. To hold otherwise would contravene the purpose of the 120-day period *** ." *Id.*, at 390. Most importantly, our supreme court instructed that:

> "[t]his ruling does not prohibit a defendant from objecting to a trial date set outside of the 120-day period by trial courts, but rather allows courts the opportunity to *propose* such a date in the interest of efficiency and convenience to both parties and the court, and gives defendants the option of accepting or rejecting the proposed date." *Id.*

¶ 68 The court further instructed that:

> "[S]hould a defendant wish to employ section 103-5(a) as a shield against any attempt to place his trial date outside the 120-day period, he is free to do so. To allow section 103-5(a) to be used as a sword after the fact, to defeat a conviction, however, would *** allow defendants to use a procedural loophole to obstruct justice." *Id.*

¶ 69 Further, we are mindful that defense counsel's representations on the record contributed to the court's decision to select the date for a preliminary hearing that would be "a little farther out" than typically scheduled in less complicated prosecutions. Judge McCuskey, an experienced jurist, seemed very aware of the statutory 30-day deadline for a preliminary hearing to take place. 725 ILCS 5/109-3.1(b) (West 2016). Judge McCuskey asked defense counsel on September 22, 2016, whether defense counsel had any "objection to a preliminary hearing date a little farther out." Defense counsel affirmatively and unconditionally responded to the court's

21

inquiry by stating that defendant did not object to a preliminary hearing taking place a little farther out. The court acted on defense counsel's representation to the court.

¶ 70    In similar fashion, on April 19, 2018, for speedy trial purposes, Judge Kouri directly asked if defense counsel agreed with the State's calculations of prosecutorial delay up until that point in time. Defense counsel responded by agreeing that the State was responsible for a mere 13 days of delay from defendant's arrest on September 12, 2016, to April 19, 2018. Counsel went on to inform the court that all delay from September 22, 2016, to the previously set jury trial date on May 7, 2018, was strategically beneficial to defendant.[12] However, counsel documented for the record that any delay beyond May 7, 2018, would not benefit defendant's trial strategy. Based on this discussion, the parties and the court agreed that a July 9, 2018, trial date would not violate defendant's right to a speedy trial. See *People v. Palmer*, 2021 IL 125621, ¶ 77 (providing that litigants may not take a position, benefit from that position, and then take a contrary position in a later proceeding); *Cordell*, 223 Ill. 2d at 390 (providing that defendants may not use the provisions of section 103-5(a) as both a sword and a shield). In light of the defendant's express waiver of any speedy trial concerns up to the date of July 9, 2018, we conclude defense counsel was *not* ineffective for failing to file a motion to dismiss Count I on speedy trial grounds, because such a motion was meritless due to defense counsel's strategic waiver of speedy trial.

¶ 71    Interestingly, defendant does not quarrel with defense counsel's strategic decision to waive speedy trial for the majority of this case to prevent the State from conducting a separate trial on the charge of concealment of a homicidal death, thereby giving the State an opportunity for a dry run on the future murder charges. Instead, defendant has raised a narrow challenge to

---

[12]Counsel on appeal makes the same concession regarding the tolling of the speedy trial period from September 22, 2016, to May 7, 2018.

22

the effectiveness of counsel by claiming counsel should have filed a motion to dismiss count I on speedy trial grounds. These additional procedural details cause this court to conclude that the rationale of *Uryasz* does not dictate the outcome here.

¶ 72    In sum, we hold that defendant's agreement and/or failure to object to the November 29, 2016, preliminary hearing date caused the speedy trial period to toll from September 22, 2016, to November 29, 2016.[13] We further hold that defense counsel's representations to the State and the court on April 19, 2018, operated as an express waiver of any speedy trial violation up until the July 9, 2018, trial date. For these reasons, defendant received a speedy trial.

¶ 73                                    2. Motive Evidence

¶ 74    On appeal, defendant argues the motive evidence presented by the State, pertaining to the financial affairs of both defendant and the victim, was irrelevant and inadmissible. Defendant argues defense counsel was ineffective for failing to reassert defendant's pretrial objection to the State's motive evidence at trial. To be sure, defense counsel filed a pretrial motion to bar evidence of defendant and the victim's financial affairs at trial. In the pretrial motion, counsel argued this evidence was "irrelevant, immaterial, and prejudicial." The circuit court denied the motion, except for excluding a single handwritten note for lack of foundation.

¶ 75    On appeal, defendant bears the burden of establishing that there was a reasonable probability that the court would have sustained counsel's objection to motive evidence at trial had the objection been renewed. *People v. McCallister*, 193 Ill. 2d 63, 103 (2000). The State argues defendant fails to meet this burden where the evidence was, at minimum, relevant. Thus, the jury was entitled to decide what weight should be accorded to the evidence.

---

[13]Defendant concedes on appeal that if the delay between September 22, 2016, and November 29, 2016, is attributed to defendant, defendant's speedy trial claim fails.

¶ 76          Generally, all relevant evidence is admissible, except as otherwise provided by law, and evidence that is not relevant is not admissible. Ill. R. Evid. 402 (eff. Jan. 1, 2011). Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011).

¶ 77          Moreover, it is well established that the State is entitled to introduce relevant evidence which tends to show than an accused had a motive to kill the deceased. *People v. Cook*, 2018 IL App (1st) 142134, ¶ 53; see *People v. Rush*, 294 Ill. App. 3d 334, 341 (1998) ("[e]vidence which tends to establish that the accused had a motive for killing the victim is relevant, *** if the evidence, at least to a slight degree, tends to establish the motive relied on, [and] is also competent.").

¶ 78          In the instant case, the jury learned that the victim recently stopped withdrawing funds that she told a bank employee that she had been withdrawing to help someone out. Obviously, the recipient of the withdrawals was no longer being "helped out" once the withdrawals ceased.

¶ 79          At the same time, defendant owed money on several high interest loans, and witnesses observed defendant gambling daily. The victim was last seen several months after the withdrawals ceased. On the date the victim was last seen, defendant, who had been previously prompt with loan payments, received notice that he was late on a high interest loan payment. The record further establishes that defendant had intimate knowledge of the victim's financial affairs, and that defendant's wife, Diane, was a contingent beneficiary to the victim's IRA. Ultimately, it was up to the trier of fact to connect the dots, or not, in order to decide if defendant was benefitting from the victim's generosity before the withdrawals ceased.

24

¶ 80      The record supports defendant's argument that the State's evidence did not directly link the withdrawals from the victim's IRA account to the funding of defendant's gambling habits, or to the timely payments defendant made on his loans. However, the State's evidence was such that a reasonable jury could have inferred that defendant was experiencing financial difficulties and that the victim was providing defendant with financial assistance. Thus, this circumstantial evidence cleared the very low evidentiary bar of relevance. It was within the province of the jury to determine the significance of this evidence.

¶ 81      For these reasons, we hold that counsel's performance was not deficient for failing to renew an objection to the financial motive evidence.

¶ 82                                      B. Cumulative Error

¶ 83      Lastly, defendant argues the accumulation of seven errors, which we perceive to involve at least three unpreserved errors, requires a new trial.[14] The caselaw provides that defendants may obtain a new trial on the ground of cumulative error where several trial errors, though not sufficiently egregious to warrant a new trial in and of themselves, create a pervasive pattern of unfair prejudice to the defendant's case. *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). However, the cumulative errors that warrant such an extreme result must be extreme individually. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 55. Generally, no cumulative error exists where the alleged errors do not amount to reversible error on any individual issue. *Id*. Put differently, when reviewing a claim that defendant did not receive a fair trial due to cumulative error, courts employ the same test that applies to second prong plain error, that is, "whether a substantial right has been affected to such a degree that we cannot confidently state that

---

[14]This court has already established that the State's presentation of motive evidence was not in error. Thus, despite defendant's inclusion of this issue in his cumulative error claim, no further analysis on the motive issue is required

defendant's trial was fundamentally fair." *People v. Blue*, 189 Ill. 2d 99, 138 (2000). Thus, unlike first prong plain error analysis, the cumulative error test considers only the prejudice caused by the error in combination with other error, it does not consider the closeness of the evidence. *People v. Jones*, 2019 IL App (3d) 160268, ¶ 49.

¶ 84       For the convenience of the reader, we analyze the preserved and unpreserved claims of error separately. Then, our discussion will shift to analyze whether the cumulative impact of the purported errors rendered defendant's trial fundamentally unfair.

¶ 85                                         1. Preserved Errors

¶ 86                                   a. Spousal Privilege/Hearsay

¶ 87       Defendant argues the court erroneously allowed the State to introduce several statements defendant made to his wife, Diane, about going horseback riding with Jack Sims on September 7, 2016, that were repeated by Diane to friends and family members. Defendant submits that these statements should have been excluded by the court based on both spousal privilege and hearsay considerations. The State responds by conceding that Diane's statements to Guliano, Leslie, and Soens, on or about September 7, 2016, regarding defendant's horseback riding story, were inadmissible hearsay, regardless of whether spousal privilege applied.

¶ 88       Based on the State's concession, we hold that the statements in question were admitted in error.

¶ 89                                   b. Violation of Pretrial Order

¶ 90       Defendant argues the prosecution erred by violating the court's pretrial order denying the prosecution's motion to admit the recording of a September 26, 2016, phone call defendant made to Zeitler from jail. Defendant asserts the substance of this conversation was irrelevant because the conversation did not demonstrate why defendant was angry with Hundt. Defendant argues

26

the State improperly invited the jury to speculate that defendant was upset with Hundt for cooperating with the police. The State argues no error occurred where, consistent with its pretrial order, the court denied the State's request to admit a recording of the phone call at trial.

¶ 91    At trial, in an attempt to lay the foundation for the admission of the September 26, 2016, phone call, the prosecutor asked Zeitler:

> "[a]nd in that conversation [defendant] said [defendant] was, this is what [defendant] told you on September 26, 2016, that Bob Hundt was bragging and [defendant] told you, I can't tell you on the phone but Hundt can get himself in trouble. He should f***ing shut up. That's what defendant said?"

¶ 92    Defense counsel objected to the prosecutor's question and the parties held a sidebar conference. After the conference, Zeitler was allowed to testify that defendant sounded upset during the phone call. The recording of the phone call was never admitted.

¶ 93    Accordingly, the record affirmatively rebuts defendant's claim that the State violated the court's pretrial order prohibiting the admission of the phone call. Not only was the recording never admitted, but Zeitler never testified to the contents of the recording. For these reasons, no error occurred regarding the prosecution's alleged violation of a pretrial order.

¶ 94                        c. Popplewell's Nuisance Testimony

¶ 95    Defendant argues Popplewell's statement that she viewed defendant as a nuisance was irrelevant and a smear of defendant's character. The State contends that to the extent that Popplewell's statement was improper, it was harmless beyond a reasonable doubt. Because the State does not contest whether Popplewell's statement was error, we accept the State's concession of error.

27

¶ 96                          d. Galletti's Impromptu Statement

¶ 97        At trial, Galletti gave an unresponsive answer to a prosecutor's question, and stated that he had "heard stories that [defendant] was a Vietnam vet, that he has killed a lot of people." Again, the State does not rebut defendant's contention that Galletti's impromptu statement constituted error. Thus, we accept the State's concession of error.

¶ 98        To summarize, we conclude that three errors arise out of the four purported errors preserved by defendant.

¶ 99                               2. Unpreserved Errors

¶ 100                           a. Zehr Principles/Rule 431(b)

¶ 101        Rule 431(b) provides that the court shall ask each juror whether that juror "*understands and accepts*" the four *Zehr* principles. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). As the State concedes, the court violated Rule 431(b) by asking a single juror, Herr, whether he accepted, but not whether he understood, the principle that a defendant is not required to offer any evidence in his defense. The State's concession is supported by the record. Thus, clear and obvious error occurred regarding a violation of Rule 431(b).

¶ 102              b. The State's Closing Argument/Mischaracterization of Testimony

¶ 103        Defendant argues the prosecutor erred by misstating Jensen's testimony during closing argument. Specifically, Jensen testified at trial that the victim told Jensen she was withdrawing money to help "someone" out. In contrast, the prosecutor stated during closing argument that the victim was regularly withdrawing money from her account to help a "friend." The prosecutor's isolated comment was not clear error.

¶ 104        Prosecutors are afforded a wide latitude during closing argument and may remark on any fair and reasonable inference the evidence yields. *People v. Nicholas*, 218 Ill. 2d 104, 121

28

(2005). Certainly, the jury here could have reasonably inferred from the evidence that the victim was withdrawing money from her account to assist a friend, who may or may not have been defendant. Thus, no clear and obvious error occurred here where the prosecutor's statement constituted a reasonable interpretation of the evidence.

¶ 105   Next, we consider the harmless nature and/or prejudicial effect of each individual error identified by this court. Our discussion includes three preserved errors and one unpreserved error.

¶ 106                              3. Harmless Error/Prejudicial Effect

¶ 107   Defendant argues the first identified error, related to various details about defendant's actions and/or statements to his wife, Diane, that were later relayed to Guliano, Leslie, and Soens, on or about September 7, 2016, severely damaged his case.

¶ 108   The admission of Diane's hearsay statements to her friends and/or family constitutes harmless error in our view. This evidence was cumulative of other properly admitted evidence linking defendant to 12, 40-pound, bags of manure purchased from a local Walmart on September 2, 2016. See *People v. Becker*, 239 Ill. 2d 215, 240-41 (2010) (instructing that improperly admitted evidence that is merely cumulative or duplicates properly admitted evidence is rendered harmless). The undisputed evidence at trial established that the victim's body was discovered buried in a shallow grave and covered with manure on a vacant property defendant maintained for Joe Maavich. Bags of manure were discovered next to one of the garages on the same property. Utilizing the bar codes on the bags discovered, a Walmart employee was able to match the bags of manure purchased by defendant on September 2, 2016, to those bags discovered at the scene.

¶ 109　　　　The undisputed evidence linking defendant to bags of manure found near the victim's

shallow grave on September 7, 2016, provided compelling circumstantial evidence against

defendant. The fact that defendant smelled like a horse and/or manure to his wife, becomes

insignificant in light of the evidence that defendant purchased the manure discovered at the crime

scene. For this reason, any error in the admission of these statements was harmless and does not

approach reversible error standing alone.

¶ 110　　　　Turning to Popplewell's testimony, we agree with the State that Popplewell's

characterization of defendant as a "nuisance" was harmless. Simply stated, we fail to see how

Popplewell's isolated utterance that she considered defendant a "nuisance" rises to the level of

reversible error and in of itself.

¶ 111　　　　Next, we consider Galletti's impromptu comment that he had "heard stories that

[defendant] was a Vietnam vet, that he has killed a lot of people." The record reveals this

unresponsive comment was subject to an immediate objection from defense counsel. The court

sustained counsel's objection. Thereafter, the court swiftly instructed the jury that they "should

disregard the last — that last descriptive comment from the witness."

¶ 112　　　　Accordingly, this error was immediately cured when the court sustained defendant's

objection and instructed the jury to disregard the "descriptive comment" while judiciously

avoiding emphasizing the non-responsive remark from the witness. See *People v. Bartall*, 98 Ill.

2d 294, 317 (1983) (instructing that a court cures error arising from improper testimony by

sustaining an objection to the testimony and instructing the jury to disregard the testimony); see

also *People v. Bolar*, 225 Ill. App. 3d 943, 945-46 (1992) (instructing that any prejudice in the

introduction of testimony regarding other crimes committed by defendant is generally cured by

sustaining the objection and instructing the jury to disregard the statement). Moreover, the

30

prejudicial effect of Galletti's utterance is dampened when considered alongside Galletti's testimony on direct examination that Galletti and his partner took defensive positions when securing the crime scene prior to observing defendant as the driver of the suspicious vehicle that appeared to be circling the area.

¶ 113       The court's failure to strictly comply with Rule 431(b) while questioning a single prospective juror was not preserved by defendant for review on appeal. In such cases, the error is reviewable under the second prong of plain error where the error was so serious as to affect the fairness of defendant's trial and challenge the integrity of the judicial process. *People v. Belknap*, 2014 IL 117094, ¶ 48. Our supreme court has instructed that violations of Rule 431(b) are not cognizable under the second prong of plain error absent evidence that the violation produced a biased jury, which defendant does allege here. *People v. Sebby*, 2017 IL 119445, ¶ 52. Therefore, this violation of Rule 431(b), though error, was of little consequence standing alone.

¶ 114                                  4. Cumulative Impact of Errors

¶ 115       In sum, none of the errors we have identified approach reversible error individually. Even when considered cumulatively, these routine trial errors were not so extreme that defendant received an unfair trial. *Sims*, 2019 IL 170417, ¶ 55 (providing that cumulative errors warranting reversal must be extreme — and that no cumulative error exists where the alleged errors do not amount to reversible error on any individual issue). Accordingly, we reject defendant's argument that the cumulative impact of these four errors (the hearsay statements, Popplewell and Galleti's statements, and the violation of Rule 431(b)) rose to the level of structural error or resulted in an unfair trial. Defendant's convictions are affirmed.

¶ 116                                  III. CONCLUSION

¶ 117       The judgment of the circuit court of Putnam County is affirmed.

¶ 118    Affirmed.

¶ 119    PRESIDING JUSTICE McDADE dissenting in part and specially concurring in part:

¶ 120    The majority affirms defendant's convictions for first degree murder and concealment of a homicidal death stemming from the death of his sister-in-law, Deborah Dewey. The majority finds that cumulative error was not committed because the errors identified by defendant are nothing more than "routine trial errors." *Supra* ¶ 116. Respectfully, the failure of a trial court to comply with Rule 431(b) threatens the very integrity of the criminal trial. When this error is considered in conjunction with the numerous other errors identified by the majority, reversal is required under the cumulative error doctrine. I therefore dissent.

¶ 121                              A. Cumulative Error

¶ 122    Before discussing the errors in this case in more detail, I am compelled to first address an often-recurring point of law quoted by the majority. Citing to this court's prior decision in *Sims*, 2019 IL App (3d) 170417, ¶ 55, the majority states that "[g]enerally, no cumulative error exists where the alleged errors do not amount to reversible error on any individual issue." *Supra* ¶ 84. This same proposition is found in myriad other cases. *E.g.*, *People v. Green*, 2017 IL App (1st) 152513, ¶ 118; *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005); *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002).

¶ 123    Respectfully, this particular point of law is patently incorrect on its face. The very notion of cumulative error contemplates that none of the component errors will be individually reversible. If any of those individual errors was grounds for reversal, there would be no need for cumulative error analysis. Indeed, simply by raising a cumulative error argument, a defendant tacitly concedes that none of the component errors is reversible. This erroneous proposition finds no support in case law from our supreme court; in fact, that court has explicitly stated otherwise.

32

*People v. Speight*, 153 Ill. 2d 365, 376 (1992) ("Certainly, while individual trial errors may not require a reversal, those same errors considered together may have the cumulative effect of denying defendant a fair trial."). The supreme court has never, to my knowledge, repudiated this position. We should stop promulgating this incorrect statement of the law.

¶ 124    Turning to the Rule 431(b) violation in this case, the State concedes that clear and obvious error was committed where the court failed to ask one eventual juror whether he understood the principle that defendant was not required to produce evidence in his defense. Rule 431(b) explicitly requires that the trial court ask each potential juror "whether that juror understands and accepts" four core principles of criminal law, including "that the defendant is not required to offer any evidence on his or her own behalf." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

¶ 125    Any violation of Rule 431(b) is a serious error. By way of analogy, no reasonable athlete would accept the validity of a loss of a critically important competition where the calls determining the outcome are made by a referee or umpire who neither knows, understands, or accepts the most fundamental rules of the game; why would a similar deficiency be considered acceptable at a criminal trial, where the stakes are immeasurably higher? See *People v. Webb*, 2021 IL App (3d) 180699-U, ¶¶ 58-59 (McDade, J., specially concurring). The significance of the court's error in this case is especially troubling. By failing to ensure that every juror understood the principle in question, the court created a *likelihood* that one or more of them might shift the burden of proof by holding against the defendant any perceived absence or weakness of evidence countering that produced by the State. Any such likelihood is unacceptable. Furthermore, the court's failure to inquire as to whether the juror understood that principle also undermines his claim to have accepted that principle. The "understand" question is

the threshold inquiry; how can a juror fully accept a principle that he does not know or understand?

¶ 126    Error in the delivery of the Rule 431(b) principles or the corresponding inquiries so fundamentally undermines the integrity of the trial that such an error should be cause for automatic reversal. Clearly, supreme court precedent does not presently support that position. The court has consistently held that Rule 431(b) failures do not rise to the level of structural error, thus allowing them to be considered harmless. *E.g.*, *People v. Birge*, 2021 IL 125644, ¶ 24 ("[A] violation of Rule 431(b) is not a second-prong, structural error that requires automatic reversal under a plain-error analysis."); *People v. Glasper*, 234 Ill. 2d 173, 199-200 (2010) (holding that Rule 431(b) error is subject to harmless-error analysis).

¶ 127    Though it has held that Rule 431(b) errors are not grounds for automatic reversal, our supreme court has never found that those errors are insignificant. Even among nonstructural errors, some errors are, of course, far more serious than others. *People v. Millsap*, 2021 IL App (3d) 190364-U, ¶ 58 ("That *** an error alone does not itself rise to the level of structural error *** is not to say that the error is not serious."). The supreme court has had little occasion to directly address the true gravity of a Rule 431(b) error because the issue arises almost invariably in the context of plain error.  That review, in turn, is limited to the first prong of plain error analysis, the closely balanced test, which necessarily omits any consideration of the magnitude of the error. *E.g.*, *People v. Sebby*, 2017 IL 119445, ¶¶ 51-52, 69 (rejecting the State's argument that the "substantiality" of the Rule 431(b) error must be considered); see *People v. Herron*, 215 Ill. 2d 167, 187 (2005) (holding that reversal is required under the first prong "when the evidence is close, regardless of the seriousness of the error"). The court has, at the very least, implied that Rule 431(b) errors are serious in nature. *Sebby*, 2017 IL 119445, ¶ 69; *People v. Zehr*, 103 Ill. 2d

34

472, 477 (1984) (holding that questions on certain "basic guarantees" are "essential" and "vital"). I have found no case in which the court has considered a Rule 431(b) violation in the context of a cumulative error claim.

¶ 128    There should be no dispute that a Rule 431(b) error, while not deemed structural in nature, is nonetheless a very serious error, and one with critical consequences. In an extension of our supreme court's determination that such an error is not, standing alone, grounds for automatic reversal, the majority here concludes that the Rule 431(b) violation "was of little consequence *standing alone*." (Emphasis added.) *Supra* ¶ 114. But the error in this case does *not* stand alone. It was accompanied by numerous other clear and obvious errors detailed by the majority, many of which the State concedes were error. Defendant makes no claim that the Rule 431(b) violation is, on its own, grounds for reversal. He only argues that such a serious error, in conjunction with *many other errors*, warrants reversal under a theory of cumulative error. I agree.

¶ 129    Three witnesses at defendant's trial testified in violation of marital privilege and hearsay rules. *Supra* ¶¶ 88-89. Another witness improperly testified that she found defendant to be a nuisance. *Supra* ¶ 96. Finally—and alarmingly—the jury heard testimony that a witness had "heard stories that [defendant] was a Vietnam vet, that he has killed a lot of people." *Supra* ¶ 98.

¶ 130    Some of these errors serve to illustrate the wide-ranging, pervasive harm a Rule 431(b) violation can have in a criminal trial. The three witnesses who testified in violation of marital privilege and hearsay rules each described text messages from defendant's wife, which relayed defendant's account of going horseback riding on September 7, 2016. The witnesses conveyed Diane's opinions that defendant was not a person that rode horses and that defendant, upon his

return, "smelled like shit." The clear purpose of the evidence was to demonstrate that defendant had not actually been riding a horse but had instead been burying Dewey's body under manure.

¶ 131    In light of such evidence, any juror is likely to wonder why defendant could not produce any evidence showing that he was, in fact, riding a horse that day. This is human nature. A juror who does not understand that a defendant is not required to offer any evidence on his own behalf is far more likely to hold this lack of evidence against defendant, thus improperly shifting the burden of proof to him. Thus, the harmful effect of a Rule 431(b) violation is only compounded by subsequent trial errors.

¶ 132    In sum, the series of errors in this case, beginning with the serious violation of Rule 431(b), created the type of pervasive pattern of unfair prejudice contemplated in *Blue*. *Blue*, 189 Ill. 2d at 139. The errors collectively undermined the fairness of defendant's trial and threatened the integrity of the judicial process. See *Glasper*, 234 Ill. 2d at 197-98. Relief must be granted "*regardless* of the strength of the evidence of defendant's guilt." (Emphasis in original.) *Blue*, 189 Ill. 2d at 138. We should vacate defendant's convictions and remand the matter for a new trial.

¶ 133                                      B. Speedy Trial

¶ 134    Because defendant's speedy trial argument offers potentially greater relief—outright reversal of his conviction for concealment of a homicidal death—I must also address it here. The majority holds that defense counsel was not ineffective for not bringing a motion to dismiss on speedy trial grounds. Ultimately, I agree. However, I disagree with certain portions of the majority's analysis.

¶ 135    As the majority points out, the speedy trial statute was amended in 1999, to require that "[d]elay shall be considered to be agreed to by the defendant unless he or she objects to the delay

by making a written demand for trial or an oral demand for trial on the record." Pub. Act 90-705 (eff. Jan. 1, 1999) (amending 725 ILCS 5/103-5(a)).

¶ 136    Defendant did not raise such an objection on September 15, 2016, when he requested time to procure counsel. Neither defendant nor counsel objected on September 22, 2016, when the court scheduled a preliminary hearing for November 29, 2016. Pursuant to the speedy trial statute, the 77 days between September 15 and November 29 are therefore "considered to be agreed to by the defendant," such that they may not be counted toward the 120-day limit. 725 ILCS 5/103-5(a) (West 2016). Those 77 days represent the only period of time in dispute in this appeal. There was no speedy trial violation, and counsel thus did not perform deficiently by declining to move to dismiss the concealment of a homicidal death charge on speedy trial grounds.

¶ 137    No further analysis is necessary. The majority, however, repeatedly emphasizes what it characterizes as "defense counsel's strategic decision to waive speedy trial." *Supra* ¶ 72. In making these many references to the so-called waiver, the majority improperly expands the nature and effect of counsel's actions.

¶ 138    On November 29, 2016, the parties announced an agreement for a scheduled trial date of May 8, 2017. The trial court, in turn, asked defendant whether he was "waiving the right to a speedy trial so that you can obtain that date." Defendant's affirmative response to that question amounted to nothing more than an agreement to toll the speedy trial clock for the contemplated period. It cannot be construed as a relinquishment of defendant's right to a speedy trial, or an abandonment of any existing or future claims.[15]

---

[15]I would suggest that the term "waiver" in the context employed by the trial court, while not uncommon, is a misnomer. A waiver "is the voluntary relinquishment of a known right." *People v.*

37

¶ 139 Contrary to the majority's implications, the "waiver" of November 29, 2016, and those that followed in the ensuing 17 months, had no bearing on the 77 days between September 15, 2016, and November 29, 2016. Again, that is the only period in dispute in this appeal.

¶ 140 The majority goes a step further when it holds that counsel's comment on April 19, 2018, in which he explained the strategic reasons underlying his agreement to nearly 17 months of continuances, "operated as an express waiver of any speedy trial violation up until the July 9, 2018, trial date." *Supra* ¶ 73.

¶ 141 First, the parties agree that the period of time between May 7, 2018, and July 9, 2018, is solely attributable to the State for speedy trial purposes. Only the majority believes otherwise. Second, and of greater concern, the observation that defendant waived "any speedy trial *violation*" (emphasis added) seems to indicate not simply that defendant had agreed to certain continuances, but that he had somehow waived his ability to bring a speedy trial claim that already existed. Not only is this not supported by the record—counsel's comments on April 19, 2018, were made in the context of his objection to further delay—but any purported waiver of an existing, meritorious speedy trial claim would unquestionably be ineffective assistance of counsel.

¶ 142 Finally, citing the continuance discussions held on April 19, 2018, the majority notes that defense counsel agreed that only 13 days had come off the speedy trial clock at that point and that a July 9, 2018, trial, even over his objection, would not be in violation of the speedy trial statute. *Supra* ¶ 71. The majority then cites *Palmer*, 2021 IL 125621, ¶ 77, in support of the

_____

*Phipps*, 238 Ill. 2d 54, 62 (2010). The mere agreement to a temporary tolling of the statutory period is not tantamount to a relinquishment of the right to a speedy trial.

proposition that "litigants may not take a position, benefit from that position, and then take a contrary position in a later proceeding." *Supra* ¶ 71.

¶ 143    *Palmer*, and its discussion of judicial estoppel, is inapposite, as defendant gained no benefit from agreeing to the July 9 trial date. More generally, counsel's own calculation of the days remaining on the speedy trial clock, and his agreement as to whether a scheduled trial will satisfy the statute, should play no role when considering whether counsel was ineffective for failing to raise a speedy trial claim. Rare is the scenario in which counsel is well aware that the speedy trial term has run, but simply declines to pursue dismissal. Rather, ineffectiveness in this context inevitably arises from counsel's miscalculation of days or misattribution of continuances. It makes very little sense that a reviewing court would then invoke those mistakes as evidence *against* counsel's ineffectiveness.

¶ 144    At best, the majority's extended discussion of waiver in the present case is superfluous. At worst, it makes a misleading and ill-advised contribution to speedy trial jurisprudence. I therefore do not join in those portions of the majority's analysis.